Opinion by Justice Moseley *342 The Department of Family and Protective Services (the Department) filed a petition to terminate Mother's and Father's parental rights to their children, Emily and Greg.[1] The trial court entered orders terminating Mother's and Father's parental rights after a Fannin County jury determined: (1) that they had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; (2) that they had failed to comply with the provisions of a court order that specifically established the actions necessary for them to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of their removal for abuse or neglect; and (3) that termination of their parental rights was in the best interests of the children.[2] See TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), (2) (West Supp. 2017).
In her sole issue on appeal, Mother argues that the evidence is factually insufficient to support the jury's verdict. Father also argues that the evidence was factually insufficient to support the verdict and that the trial court erred in refusing his request for an instruction that "[f]ailure to complete the service plan can be excused if it was unreasonable for the parent to be required to complete that plan."
We conclude that Mother did not preserve her sole point of error on appeal. We further find that the evidence was sufficient to support a finding (1) that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being and (2) that termination of Father's parental rights was in the best interests of the children.[3] Accordingly, we affirm the trial court's judgment.
I. Mother Did Not Preserve Her Sole Point of Error on Appeal
Mother challenges the factual sufficiency of the evidence supporting the jury's verdict. The State argues that Mother has waived her sole point of error on *343 appeal because she did not file a motion for new trial. We agree.
The Texas Rules of Civil Procedure require the filing of a motion for new trial as a prerequisite to asserting a complaint on appeal regarding the factual sufficiency of the evidence supporting a jury finding. In re A.L. , 486 S.W.3d 129, 130 (Tex. App.-Texarkana 2016, no pet.) (citing In re O.M.H. , No. 06-12-00013-CV, 2012 WL 2783502, at *2 (Tex. App.-Texarkana July 10, 2012, no pet.) (mem. op.); see TEX. R. CIV. P. 324(b)(2) ; Cecil v. Smith , 804 S.W.2d 509, 512 (Tex. 1991) ). "Where, as here, there is no motion for new trial raising factual sufficiency challenges to the jury's verdict, '[f]actual sufficiency is not preserved for appeal.' " Id. (quoting O.M.H. , 2012 WL 2783502, at *2 ) (footnote omitted) (citing In re M.S. , 115 S.W.3d 534, 547 (Tex. 2003) ); see In re L.G.D. , No. 06-17-00061-CV, 2017 WL 4507673, at *1 (Tex. App.-Texarkana Oct. 10, 2017, pet. denied) (mem. op.).
Because Mother has not preserved a factual sufficiency challenge to the jury's verdict, we overrule her sole point of error on appeal.
II. Factually Sufficient Evidence Supports the Jury's Verdict Terminating Father's Parental Rights
A. Standard of Review
"The natural right existing between parents and their children is of constitutional dimensions." Holick v. Smith , 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof-clear and convincing evidence-is required at trial." In re A.B. , 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is ... sufficient to support the termination of parental rights." Id. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." In re S.K.A. , 236 S.W.3d 875, 900 (Tex. App.-Texarkana 2007, pet. denied) (quoting Holick , 685 S.W.2d at 20 ).
In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2017); In re E.N.C. , 384 S.W.3d 796, 798 (Tex. 2012). " 'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.' " TEX. FAM. CODE ANN. § 101.007 (West 2014) ; see In re J.O.A. , 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.
In our review of factual sufficiency, we give due consideration to evidence that the jury could have reasonably found to be clear and convincing. In re H.R.M. , 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only the evidence that the fact-finder reasonably could have found to be clear and convincing and determine "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the ... allegations." Id. (quoting In re C.H. , 89 S.W.3d 17, 25 (Tex. 2002) ); In re J.F.C. , 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a *344 fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." J.F.C. , 96 S.W.3d at 266. "[I]n making this determination," we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." A.B. , 437 S.W.3d at 503 (quoting C.H. , 89 S.W.3d at 26 ).
Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." In re A.V. , 113 S.W.3d 355, 361 (Tex. 2003) (quoting In re J.W.T. , 872 S.W.2d 189, 195 (Tex. 1994) ); see In re M.S. , 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." In re C.A.J. , 459 S.W.3d 175, 179 (Tex. App.-Texarkana 2015, no pet.) (citing C.H. , 89 S.W.3d at 26 ).
B. The Evidence at Trial
The heart of this case concerns extensive injuries sustained by Greg on April 10, 2016, when he was approximately ten weeks old. At trial, the main issue was whether Greg sustained these injuries as a result of abuse or a medical condition. Consequently, we review Greg's medical history in detail.
Mother was diabetic during her pregnancy with Greg, who was born by scheduled cesarean section January 20, 2016, weighing eleven pounds and seven ounces. Greg experienced respiratory complications at birth, required additional days in the hospital, was diagnosed with jaundice, and was discharged January 24, 2016, weighing ten pounds. Timothy Brumitt, Greg's pediatrician who had also treated Mother as a child, saw Greg at a follow-up visit on January 27 and testified that his weight loss was within normal limits considering that Greg's birth weight was in the ninety-seventh percentile and that Mother had consistently reported that Greg was not eating properly and was often throwing up.
Testimony at trial established that Greg was sick, cried often, and sometimes experienced discoloration. Mother testified that Greg began choking on January 31 and that she "held him over the couch on the palm of [her] hand and started to pat his back." Mother and Father both testified that they were able to clear Greg's airway, but on February 1, 2016, Greg presented to the Texoma Medical Center Emergency Room where Mother and Father reported that he was coughing, turning purple while crying, and congested. Greg's chest x-rays appeared to be normal, and he was discharged. However, on February 3, 2016, Greg returned to the emergency room after Mother and Father reported that he was choking. Greg was diagnosed with colic, and, after a February 5 follow-up appointment, was also diagnosed with sinusitis and an upper respiratory infection. Photographs taken of Greg on February 7, 2016, depicted discoloration under his eyes and on his face. Although Greg weighed less than he did at birth at another February 10 appointment, Brumitt testified that he was unconcerned by Greg's weight in light of his complications.
Brumitt discovered that Greg had a heart murmur. On February 15, 2016, Greg went to Pediatrix Cardiology, where doctors discovered two small holes in his heart, which were predicted to close on their own, and, according to Mother, a hole in his lung. Greg's March 21 appointment was routine, and Brumitt testified that he was still unconcerned by Greg's weight. Brumitt explained that Greg was stripped down at every checkup and that he never saw any bruising on the child. Mother testified that Greg was also thoroughly *345 examined at a Women, Infants, and Children (WIC) appointment on April 4.
On April 10, 2016, Mother and Father took Emily and Greg to a family gathering. Family members testified that they did not see any unexplained bruises or injuries on Greg. After the gathering, Father with both children in tow dropped Mother off at a hair salon so she could get a haircut. Although he carried Greg that day, Father testified that he did not see the baby's face because "[t]here was nothing for me to look for at the moment." When asked whether it was possible that Greg's face was bruised as Father was taking Mother to the salon, Father said, "I wouldn't have the right answer." Father testified that he took Emily and Greg back home after Mother was dropped off, that Greg had no bruising when he went to give him a bath, but that the child would start crying when he tried to pick him up.[4] According to Father, during the bath, Greg "was trying to be fussy and crying a lot to the point he was getting red dots around his face." Father said the crying worried him because it seemed as if Greg was in pain. Father finished the bath and decided to take Greg to the emergency room. However, he chose to pick Mother up from the salon first. According to Father, they went home even though he had told Mother that the baby needed to go to the emergency room. However, once home, Father noticed that Greg was pale and had red dots on his face when Greg was taken out of the car seat. The family drove to the emergency room at that point.[5]
Although Father testified that he did not witness any bruising around Greg's eyes, the child arrived at Texoma Medical Center emergency room with "petechiae to his upper face & the area around his eyes very purple," which "looked like he'd been 'socked in the face.' " However, the whites of Greg's eyes were clear with no sign of broken blood vessels. According to medical records, Father claimed that the petechiae appeared after Greg "cried dramatically during his bath" and that this occurred often. Medical notes reflected that Mother and Father were very concerned about Greg's well-being and that he was discharged from the emergency room after "improvement [was] noted in petechiae and discoloration to periorbital area." However, due to the suspicious nature of Greg's injury, Mother took Greg to the Referral and Evaluation of At-Risk Children (REACH) Program at Children's Medical Center in Dallas, Texas.[6]
Kristen Reeder, a child-abuse pediatrician employed by REACH, testified that Greg's April 11, 2016, x-rays revealed twenty rib fractures demonstrating "at least two different ages of fractures," and a compression fracture of the L2 vertebra, "meaning that ... [an] axial-loading force ... essentially crushed that vertebra." Greg also had a right distal tibia corner fracture and a left distal femur corner fracture, both specific for abuse.[7] Mother, *346 Father, and other family members testified that this news was shocking. Mother had noted that Greg bruised "[f]airly" easily, that "[h]is skin was very sensitive," that "he would break out with the red dots a lot," and that she was convinced that Greg's injuries were the result of a medical condition. Nevertheless, Mother and Father were both arrested, and the Department placed Emily and Greg with their maternal grandmother.
On April 18, both paternal and maternal grandmothers brought Greg to Brumitt to "request[ ] repeat Xrays." Brumitt saw multiple rib fractures and an unspecified fracture of the lower leg. According to the notes, Brumitt showed the grandmothers the x-rays, which prompted them to ask for further explanations. Brumitt advised the grandmothers that he could not "determine how or why but only that they are fractures & under these circumstances most likely reason is trauma." After an April 25 follow-up visit with REACH uncovered two additional healing fractures, Emily and Greg were again removed and placed with unrelated foster parents.[8] Crystal Wrape, the Department's conservatorship caseworker, testified that the grandmothers did not believe Greg was injured and that both believed the injuries were a result of a medical condition.
At trial, Father was described as a loving husband and a caring dad. The children's paternal and maternal grandmothers testified that Mother and Father were never rough with each other or the children. Father's sister and brother echoed this testimony, swearing that Mother and Father had never lost their tempers with each other or with the children. All of the testimony indicated that Father provided well for his family, that the children were clean, and that their home was also appropriate and clean. Father denied ever hitting or shaking either of his children and professed his love for his family. Mother also denied ever hurting Greg or watching anyone else harm him, and further testified that Father was never violent and would never hurt the children. Because Mother and Father said that they were the ones who cared for Greg and that he was not left alone with anyone else long enough to have sustained the injuries, they decided to investigate the possibility that a medical condition was the root cause.
Greg's medical records were reviewed by David Ayoub, a board-certified radiologist and volunteer clinical associate professor at Southern Illinois University School of Medicine who was "specifically involved with didactic training for the radiology residents in the area of nuclear medicine, basic bone biomechanics and physiology, metabolic bone disease and pediatric skeletal trauma." Ayoub concluded that Greg's medical records demonstrated evidence of a metabolic bone disease. Ayoub believed that the multiple rib fractures, which occurred without internal injury, displacement of the ribs, or external bruising in the rib area, were signs that excessive force did not cause Greg's injuries. Instead, Ayoub believed that the child had infantile rickets and that he might have Ehlers Danlos Syndrome (EDS), which, coupled with a vitamin D deficiency, could manifest as "unexplained fractures in infancy." Ayoub explained that Greg "exhibited many signs described in infantile rickets including irritability, head sweating, GERD, poor muscle tone, [and] external hydrocephalus."
*347 Michael Holick, director of the EDS Clinical Research Program in Boston, Massachusetts, examined Mother and concluded "with a high degree of medical certainty that she has the autosomal dominant genetic disorder" of EDS. Holick noted that Greg had a fifty percent chance of having the disease and that "[t]he fractures that were observed in the son, along with many of the medical issues regarding his medical history, including having a difficult time having a normal sized meal, constantly throwing up and spitting up[, are] consistent with gastroparesis that is associated with" EDS. Holick wrote, "Based on the clinical information and pictures that were provided as also [sic] with a high degree of medical certainty that both her son and daughter have acquired this genetic disorder from their mother." Holick stated that the genetic disorder "increases risk for fragility fractures in infants and could be the explanation for the observed fractures in [Mother's] son." He opined that based on Mother's blood test results, Greg was born "in a vitamin D deficient or insufficient state," resulting in decreased intestinal calcium absorption and blood calcium level critically important for neuromuscular function and most metabolic activities. Holick explained that the body compensates by increasing the production of the parathyroid hormone, which helps to maintain the blood calcium in the normal range by removing "precious calcium stores from the skeleton, resulting in skeletal porosity, which increases the risk for fractures including those of the legs and arms." Holick stated that as a result, "children have increased risk for fragility fractures that can result from normal handling of the infant."
Reeder testified that she had reviewed Ayoub and Holick's reports, which were based on Mother's representations that "[t]here [was] never any swelling, bruises, redness, nothing" and that Greg "bruise[d] easily, that his joints click[ed], and that he flushed often without provocation."[9] Reeder testified that she had no knowledge of any study showing that children with rickets would suffer the type of fractures Greg suffered at his young age, because most of the studies conducted were of older, mobile infants who had injured themselves while attempting to stand or walk. While Reeder was aware of studies showing a correlation between low vitamin D levels and bone fractures in children, Reeder explained that Greg had "slightly low" vitamin D levels that did not concern her and that children with the disease would have "overt signs" of rickets reflected in their x-rays. Because Greg's "[x]-rays did not show any of the classic signs of rickets or the changes to the bone that we see," Reeder was "[v]ery confident" that Greg did not have rickets. Brumitt agreed with Reeder that rickets is visible in x-rays and that Greg's x-ray reports did not conclude that the child suffered from the disease. Reeder also testified that Greg had never been diagnosed with osteogenesis imperfecta or brittle bone disease, that he tested negative for osteogenesis imperfecta, and that he did not suffer "the typical snapping-type of fracture" caused by it.
Rather, Reeder explained that (1) Greg had suffered a "posterior rib fracture or a rib fracture along the back of the spine ... highly specific for child abuse" because it was "most consistent with a squeezing or compression of the chest," (2) Greg had suffered a classic metaphyseal lesion highly specific for child abuse because it *348 "require[d] a significant amount of violen[t] forces," such as "twisting, pulling, yanking on the end of that bone," (3) although petechiae could be caused by extensive crying, the pattern of petechiae around Greg's eyes, along with bruising to his eyes and a small subconjunctival hemorrhage was "more consistent with a traumatic event directly to his eyes,"[10] (4) x-rays taken at birth and on January 24 did not reveal any fractures, (5) no bruising was noted in Greg's medical records before April 10, and (6) though she could not date the fractures and did not know who caused them, there were, at a minimum, three separate events of abuse revealed by the stages of healing depicted in Greg's x-rays.
Reeder noted that Ayoub, who was "known to testify frequently for the defense in child-abuse cases" and whose "thoughts and theories are not scientifically valid and are not part of the mainstream thoughts of the pediatric community," did not diagnose Greg with EDS. Reeder also testified that she was surprised that Holick, an endocrinologist, was making an EDS diagnoses from photographs of Greg without examining him. According to Reeder, Holick only looked at two of the five Beighton criteria used for diagnosing EDS and that it was inappropriate to apply the Beighton criteria to infants in order to diagnose EDS because "hypermobility EDS means that the child or the patient is hypermobile and has hypermobile joints and skin and elasticity" and young infants are "known to naturally be more flexible." Moreover, Reeder explained that there were no scientifically valid studies showing that children with hypermobility EDS were likely to have more fractures than children who do not have EDS because the existing studies did not compare children with EDS to a control group. Brumitt also testified that he was likewise not concerned about EDS in Greg.
Reeder also testified that a normal baby gains thirty grams per day, that Greg had only gained five grams per day, and that he was only twelve pounds three ounces at ten weeks of life, which put him in the fifteenth weight percentile. According to Reeder, Greg's significant weight deviation was labeled "failure to thrive." On April 25, Greg weighed fourteen pounds and was gaining approximately fifty grams per day. According to Reeder, this confirmed that Greg's prior failure to thrive was the result of nutritional neglect, not any medical condition.
Reeder testified that REACH ruled out any metabolic issues and that there was no medical finding that could explain Greg's injuries, which aided her conclusion that they were inflicted by trauma. Mother acknowledged that six doctors came to the same conclusion that Greg's injuries were inflicted, but disagreed with their assessment. She also agreed that Greg had no broken bone while in the hospital or in the Department's care, but had suffered twenty-four broken bones while in her and her husband's care for ten weeks. Yet, she still believed a medical condition was responsible for Greg's injuries. When asked how many times she had suffered a broken bone due to EDS, Mother testified she did not know because she "did not go to the doctor every time [she] did something to hurt [herself]," but acknowledged that she had never received medical treatment for a broken bone. According to Wrape and John Armstrong, a court-appointed special *349 advocate, Greg had not suffered any broken bones or unexplained bruising in the past year while in his foster home placement.
C. Factually Sufficient Evidence Supported Termination Under Ground E
Father first argues that the evidence was factually insufficient to support termination under Ground O, which required him to comply with a court-ordered family service plan. Father, who is not a United States citizen, had been detained in Fannin County Jail as result of an immigration hold since his arrest in April 2016. Wrape testified that she was aware that Father could not work his service plan because he was incarcerated and that there were no services available to Father in jail. Wrape further testified that if Father did not inflict the harm, it was not in the children's best interests to terminate parental rights for failure to comply with the service plan under Ground O. Accordingly, we review the evidence to determine whether it is factually sufficient to support a Ground E finding that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being.
Ground E "refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." In re N.S.G. , 235 S.W.3d 358, 366-67 (Tex. App.-Texarkana 2007, no pet.) (quoting In re S.K. , 198 S.W.3d 899, 902 (Tex. App.-Dallas 2006, pet. denied) ). "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." In re Z.M. , 456 S.W.3d 677, 686 (Tex. App.-Texarkana 2015, no pet.) (quoting Perez v. Tex. Dep't of Protective & Regulatory Servs. , 148 S.W.3d 427, 436 (Tex. App.-El Paso 2004, no pet.) ); see E.N.C. , 384 S.W.3d at 803 ; N.S.G. , 235 S.W.3d at 367.
" 'Endanger' means ... to expose to loss or injury....' " N.S.G. , 235 S.W.3d at 367 (quoting Tex. Dep't of Human Servs. v. Boyd , 727 S.W.2d 531, 533 (Tex. 1987) (citations omitted)). It is not necessary that the conduct be directed at the child or that the child actually suffer injury. Under Ground E, it is sufficient that the child's well-being is jeopardized or exposed to loss or injury. Tex. Dep't of Human Servs. v. Boyd , 727 S.W.2d 531, 533 (Tex. 1987) ; N.S.G. , 235 S.W.3d at 367. Further, termination under Ground E must be based on more than a single act or omission. Instead, a "voluntary, deliberate, and conscious course of conduct by the parent is required." Perez , 148 S.W.3d at 436 (citing In re K.M.M. , 993 S.W.2d 225, 228 (Tex. App.-Eastland 1999, no pet.) ); see Boyd , 727 S.W.2d at 533 ; N.S.G. , 235 S.W.3d at 366-67.
The uncontested evidence at trial established that Greg suffered twenty-four fractures, which Reeder stated occurred as a result of substantial force and violence. While Mother and Father pointed to Ayoub and Holick's reports to suggest that Greg may have had rickets, EDS, or some other metabolic disease, the jury heard that none of the doctors who examined Greg believed he had those diseases and that metabolic diseases were ruled out by REACH. All six doctors who examined Greg determined that the broken bones were caused by child abuse.
No one at trial testified that they knew who abused Greg. However, Mother and Father said they cared for both children and that Greg was never left alone with anyone else long enough to have sustained the significant injuries. Family members testified that Greg had no injuries on April 10 at the family gathering. Father's own recollection from that day established that *350 he was taking care of Greg and Emily by himself when Greg began crying out in pain. Although he determined that Greg needed to go to the emergency room, he decided to first pick up Mother and return home. Mother testified that they were at home when she first saw Greg and that she immediately knew he needed to go to the emergency room. In light of this testimony, a rational jury could have found that Greg suffered the injuries that sent him to the emergency room while in Father's care.
Here, it was within the jury's purview to resolve credibility issues and the issue of whether Greg's injuries were the result of child abuse or a medical condition. "A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause." In re L.M.M. , 522 S.W.3d 34, 45 (Tex. App.-Houston [1st Dist.] 2017, no pet.) (quoting In re J.D. , 436 S.W.3d 105, 114 (Tex. App.-Houston [14th Dist.] 2014, no pet.) ). According to Reeder, Greg had suffered, at a minimum, three different incidents of abuse while in the care of Mother and Father. Further, while there was conflicting testimony on the issue of nutritional neglect, Reeder testified that Greg gained weight soon after his removal, which indicated that he was failing to thrive as a result of nutritional neglect. We conclude that the evidence referenced above was sufficient for a jury to form a firm belief or conviction that Father engaged in conduct or knowingly placed Greg with persons who engaged in conduct which endangered his physical well-being. See In re J.D. , 436 S.W.3d 105, 114, 116 (Tex. App.-Houston [14th Dist.] 2014, no pet.) (finding evidence sufficient under Ground E where (1) the child sustained two fractures at different times when in the parent's care, (2) the injuries were not accidental, but were caused by extreme force, (3) bone disease was ruled out, and (4) the parent was the primary caretaker, because the child would have screamed in pain so that the caretaker should have been aware of the injury); see also In re J.P.B. , 180 S.W.3d 570, 573-74 (Tex. 2005) (per curiam) (discussing Ground D).
With respect to Emily, "[a] parent's abuse of the other parent or children can support a finding of endangerment." In re D.O. , 338 S.W.3d 29, 34 (Tex. App.-Eastland 2011, no pet.). Wrape testified that a child can suffer emotional abuse when witnessing domestic violence in the home. Thus, Wrape said that Emily would have suffered emotional abuse if she was present in the home when Greg was injured. Here, Father's testimony established that Emily was in his care on April 10 when Greg sustained the injuries. Further, because Mother and Father were the primary caretakers of both children, evidence at trial showed that Greg had experienced petechiae and discoloration on more than one occasion, and Reeder testified that the abuse occurred at least three times, the jury could have determined that Emily had witnessed more than one incident of abuse and Greg's suffering.
Because we find the evidence factually sufficient to support termination of Father's parental rights under Ground E, we overrule his first point of error.
D. Factually Sufficient Evidence Supported the Best-Interest Finding
"There is a strong presumption that keeping a child with a parent is in the child's best interest." In re J.A.S., Jr. , No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.-Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing In re R.R. , 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial *351 reasons.' " In re N.L.D. , 412 S.W.3d 810, 822 (Tex. App.-Texarkana 2013, no pet.) (quoting Wiley v. Spratlan , 543 S.W.2d 349, 352 (Tex. 1976) ).
In determining the best interest of the child, courts consider the following Holley factors:
(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.
Id. at 818-19 (citing Holley v. Adams , 544 S.W.2d 367, 371-72 (Tex. 1976) ); see In re E.N.C. , 384 S.W.3d 796, 807 (Tex. 2012) ; see also TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2017). It is not necessary to prove all of these factors as a condition precedent to parental-rights termination. In re C.H. , 89 S.W.3d 17, 27 (Tex. 2002) ; N.L.D. , 412 S.W.3d at 819. Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. C.H. , 89 S.W.3d at 28.
By the time of trial, Emily was three years old and Greg was one year old. There was no evidence suggesting that the children were able to verbalize or had verbalized their desires. However, the children had remained with their foster mother, Virginia Row, who testified that she loved the children and that they had thrived in her care for over a year while Father was still detained as a result of his immigration hold. Armstrong testified that both children were happy in their current placement and had a strong bond with their foster parents. From this evidence, the jury could determine that Emily and Greg would prefer to remain in the stable, loving environment provided by Row. See In re B.H.R. , 535 S.W.3d 114, 123 (Tex. App.-Texarkana 2017, no pet.) (citing In re K.O. , 488 S.W.3d 829, 840 (Tex. App.-Texarkana 2016, pet. denied) ). Therefore, the first Holley factor weighs in favor of terminating parental rights.
With respect to the third and fourth factors, the evidence established that Emily was in play therapy and that Greg still required medical care. Row testified that Greg had difficulty ingesting food, was treated for a respiratory infection, and was recently diagnosed with hand, foot, and mouth disease. According to Row, Greg was active and had not developed red spots on his face, turned blue, or been treated for a broken bone while in her care. Mother testified that Row was required to take Greg to the emergency room after he stopped breathing. However, the evidence at trial established that Row's home was safe and loving and that both foster parents provided for the children's emotional and physical needs. In contrast, Greg suffered twenty-four broken bones and, according to Reeder, nutritional neglect while in Mother's and Father's care. Emily was constantly with Greg during that time and witnessed his physical suffering. Because Mother and Father never acknowledged that someone had inflicted Greg's injuries, the jury could have determined either that Mother and Father were protecting each other or that Mother and Father were unable to recognize the extent of Greg's physical suffering. Because "[a] fact[-]finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future," we conclude that the *352 second and third factors weigh in favor of terminating parental rights. J.D. , 436 S.W.3d at 118.
As to the fourth, fifth, eighth, and ninth factors, "[a] parent's inability to provide adequate care for [his] children, ... lack of parenting skills, and poor judgment may be considered when looking at the children's best interests." Id. at 119. The evidence showed that the children were well-groomed and clean at all times, that Father's home was appropriate, and that he was a good provider. However, Father's testimony established that he first believed that Greg needed to go to the emergency room while he was giving the child a bath, but decided not to take him to the emergency room, choosing instead to finish the bath, pick Mother up from the salon, and return home. A jury could have concluded from this evidence (1) that Father exhibited poor judgment in caring for his child and/or (2) that Father caused Greg's injuries since they occurred while in his care. Further, Father had been incarcerated for the past year on pending criminal charges for injury to a child, had an immigration hold against him because he was not a United States citizen, and faced the possibility of deportation. As a result, he was unable to take advantage of any programs available to assist him. The jury could have also determined that Father's failure to acknowledge that Greg had been injured, and his insistence that the injuries were the result of a medical condition, created a situation where Father would be unable to recognize and protect his children from future child abuse. We find that the fourth, fifth, eighth, and ninth Holley factors weigh in favor of terminating parental rights.
As for the remaining sixth and seventh factors, Father testified that his plan was to live with his wife and children in their three-bedroom home, which had already been established as appropriate. Father testified that on release, he would make $2,000.00 per month working with his contracting business, EZ Property Detail. While Father did not believe that he would be deported, Mother, who had completed her family service plan, testified that she would divorce Father if he was deported. Alternatively, the children's maternal grandmother, who lived down the road from Mother and Father, testified that the children could live with her. The maternal grandmother said that she loved Emily and Greg, that her home had bedrooms available for them, and that she would be able to care for their needs. Father's sister, who made $31,000.00 per year, lived in a three-bedroom home with a female roommate, and loved the children, also testified that she wanted to be considered as an appropriate placement for them. Wrape testified that she believed Mother and Father loved their children and admitted that she did not know who harmed the baby. Wrape also said that the children were affectionate with Mother, who visited them regularly in the foster home. However, Wrape testified that it was in the children's best interests to terminate Father's parental rights and seek an unrelated adoption because the family was in denial that Greg had suffered any inflicted injury, and there were questions about who had abused the child. Wrape, Armstrong, and Row testified that the children were happy, loved, and doing well while living with Row. Row testified that she loved Greg and Emily and wished to adopt and raise them in her stable home. In light of this evidence, we find that the remaining sixth and seventh Holley factors weigh in favor of terminating Father's parental rights.
Our Holley -factor analysis leads us to the conclusion that the evidence was factually sufficient for the jury to find that it was in Emily's and Greg's best interests to terminate Father's parental rights to *353 them. Accordingly, we overrule Father's last point of error.
III. Conclusion
We affirm the trial court's judgment.

In an effort to protect the identity of the minor children who are the subject of this appeal, we do not refer to the affected parties by their real names. See Tex. R. App. P. 9.8.

Pursuant to the jury's verdict, the trial court also terminated Mother's parental rights on the ground that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(b)(1)(D) (West Supp. 2017).

Because our conclusion that sufficient evidence supported the jury's decision to terminate Father's parental rights under Section 161.001(b)(1)(E) is dispositive, we need not address Father's complaint of alleged jury charge error.

Father testified that Greg had sustained "[a] healing bruise" on his forehead, which was previously caused when Emily hit Greg with a toy.

Melissa Pollard, a patrol sergeant with the Wood County Sheriff's Office, testified that Mother said she did not notice anything wrong with Greg before getting her hair done, but first noticed that he "appeared to be blue" when she was taking him out of the car seat after returning home.

Father testified that he did not go to the REACH appointment because he had to make arrangements to pay for a traffic ticket.

On the morning of April 11, Mother had called Brumitt to report that Greg had gone to the emergency room because his lips turned blue and his face had turned purple. She also reported that Greg's liver count was high and that he was anemic.

Reeder testified that new rib fractures in infants are "very difficult to see initially" because the bones are thin and not typically displaced and that repeat imaging two weeks after the bone begins healing is more revealing because it shows a callous. As a result, Reeder said it was fairly common to miss rib fractures in initial x-rays.

Reeder testified that there are no medical records indicating that the child bruised easily.

During cross-examination, Reeder admitted that the bruise around Greg's eyes was not significant because it resolved quickly, without going through the normal physical changes of bruising, and that the purplish color of the bruises around the eyes could be caused by crying.