**Opinion issued November 14, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-24-00379-CV

————————————

## IN THE INTEREST OF N.G.-M., K.R.-M., M.R.-M., E.R.-M., AND D.R.-M., CHILDREN

---

### On Appeal from the 315th District Court
### Harris County, Texas
### Trial Court Case No. 2022-01674J

---

## MEMORANDUM OPINION

Appellants E.F.R.G. (Father) and L.M. (Mother) have appealed the trial court's order terminating their parental rights to five children. In his appeal, Father contends the evidence was legally and factually insufficient to support the trial court's findings that his parental rights should be terminated under predicate grounds (D), (E), (N), and (O) and that termination of the parent-child relationship was in the

children's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D)–(E), (N)–(O), (b)(2). Mother at first raised the same issues but has since moved to voluntarily dismiss her appeal. *See* TEX. R. APP. P. 42.1(a). We grant Mother's motion, dismiss her appeal, and affirm the trial court's termination order.

## Background

Five of Mother's children were the subject of the termination proceeding below—a girl born in December 2018 ("Nancy"), a girl born in January 2020 ("Kate"), and triplet boys born prematurely in December 2021 ("Michael," "Evan," and "David").[1] Father lived with Mother and all five children. But his paternity was established only as to the triplets.[2]

In September 2022, before the triplets turned one, the Department of Family and Protective Services was notified that Michael and Evan were hospitalized with several fractures "all over their bodies." Mother had taken Michael to the emergency room because he had a fever, was vomiting, and had a bruise on his head. Scans revealed several injuries to Michael's body in different stages of healing. Medical records described the injuries as multiple fractures of Michael's skull, with

---

[1]     We refer to the children by pseudonyms.

[2]     Father initially testified that he was the biological parent of all five children and asked for the trial court to determine his parental rights based on his acknowledgment of paternity. But later, Father clarified that he is not Nancy's father. The termination order adjudicates Father's paternity as to the triplets and terminates his parental rights as to them and Kate. The order also terminates any parent-child relationship between Nancy and Kate and other alleged fathers.

2

"associated scalp hematomas" and subdural hemorrhaging along "the right parietal and occipital lobes" of his brain; multiple rib fractures; a fractured right femur; two "intra retinal hemorrhages" in the left eye; and "too-numerous-to-count multi-layered retinal hemorrhages" in the right eye.

Considering Michael's injuries, doctors recommended that the other children be examined. The examinations revealed that Evan also had multiple fractures of his skull, ribs, left hand, and right leg. And like Michael's injuries, Evan's injuries were in different stages of healing.

Both Mother and Father said they did not know how Michael and Evan had been injured. They suggested that three-year-old Nancy might be responsible because she roughhoused with her younger siblings. This explanation concerned the doctors, who concluded that Michael's and Evan's injuries were not caused by a child and instead pointed to physical abuse. Based on those concerns, the Department sought temporary managing conservatorship of all five children and to terminate Mother's and Father's parental rights. Both parents were later charged with injury to a child and were jailed on those charges at the time of trial.

Father and Mother participated at the termination trial with help from a Spanish-language interpreter. Father testified that because he worked at night and Mother worked during the day, the children were always in his care or Mother's care. They shared the caretaking responsibilities, did not rely on outside help like

babysitters, and did not invite other people to the house. Father denied that anyone else had access to the children.

Father testified that he and Mother were good parents who worked hard to meet the children's needs. Michael and Evan were hospitalized for about two months after being born prematurely. Doctors warned then that Michael and Evan may have special medical needs. For example, the veins and retinas in Michael's eyes did not fully develop in utero, he had "retinopathy of prematurity," and he likely would need glasses. And both Michael and Evan needed to be placed in certain positions for sleep and could not be lifted quickly because they could not move their heads. Father and Mother said that they followed the care instructions when Michael and Evan came home. According to Father, the triplets were not yet crawling when the Department became involved.

Asked if he remembered why the Department became involved, Father invoked his Fifth Amendment privilege against self-incrimination. He also refused to answer questions about why Michael was taken to the hospital, though he acknowledged Michael had a bump on his head that "wasn't normal." Mother and Father first took Michael to a pediatrician who advised taking Michael to the hospital for an X-ray, which they did.[3] Father knew the X-rays showed Michael had broken

---

[3]     According to Father, he maintained health insurance for the children, and the children received regular checkups and vaccines from the pediatrician. The pediatrician had not expressed any concern for the children's development.

4

ribs, a fractured femur, eye hemorrhages, and skull fractures. But Father denied causing the injuries and said he was surprised that doctors believed the injuries resulted from physical abuse. Father also knew of Evan's injuries but did not know what had caused them.

Asked for her opinion of why the Department became involved, Mother answered because of Michael's fall. She said that she saw Michael fall when he tried to use a chair to pull himself up. She and Father were home at the time. She did not take Michael to the doctor immediately but became concerned when she noticed the bump on his head two days later. She noticed no other symptoms, and she disputed the findings in the medical record about Michael vomiting and having a fever. She accused doctors of lying about what she told them of Michael's condition.

Like Father, Mother testified that she did not know about Michael's and Evan's bone fractures or what caused them. Unlike Michael, she never saw Evan fall. She did not remember anyone throwing Michael or Evan, shaking them, or jumping on them. But she suggested several alternative causes, including hereditary bone abnormalities on Father's side and rough play among the children. As to the latter, she claimed that she once heard Michael cry out from his crib, she ran into the bedroom, and she saw Nancy getting out of the crib.

Mother asserted that the Department had jumped to a conclusion about child abuse without adequately investigating the family or providing services. She denied

5

that she had any issue with anger, drugs, or alcohol. She said the Department never visited the family's apartment. And she never received a copy of her family service plan in Spanish, even though she asked for one. She and Father regularly visited with the children until they were jailed on the injury-to-a-child charges. Their incarceration kept Mother and Father from completing some items on the family service plan. Mother acknowledged that she could not afford a bond on her criminal charge and so could not care for the children herself at the time of trial. But she believed other family members could provide a home for all five children.

A paternal aunt testified that she wanted the Department to place Nancy and Kate with her. She had visited Mother's and Father's home and found the children to be "well taken care of," "clean," and "normal." She had never seen Mother or Father hit or mistreat the children. But she did see one of the girls be rough with Evan. The Department had once placed Nancy and Kate with the paternal aunt, but she asked for them to be removed because of her own poor health. Because her health had improved by trial, she asked for the girls to be placed with her again. A paternal uncle confirmed he would take the triplets in.

The Department's investigator, M. Wilkins, testified. She contacted the family at the hospital. The Department was concerned because two children, who were less than one year old and immobile, had multiple fractures to their ribs, both arms, both legs, and skull. Wilkins described Michael's skull fracture as "very concerning"

6

because "it looked like . . . his skull would have come off if he didn't have something holding it on." And beyond blaming three-year-old Nancy, Mother and Father could not explain the injuries. Wilkins acknowledged that she did not witness any abuse herself and did not know who inflicted the injuries. She also acknowledged that the medical records did not specify how the injuries occurred and that, as a lay person, she could not say if they were accidental or intentional. But the Department had consulted doctors who attributed Michael's injuries to causes like violent acceleration and deceleration forces, a "violent back-and-forth-motion," and blunt force trauma. And based on its investigation, the Department determined that Father and Mother had abused the children.

The Department's caseworker, S. Blaylock, also testified. She was assigned to the children's case after Father and Mother were incarcerated. She informed Father and Mother by letter that she was their caseworker, but she did not visit them in jail or inquire at the jail about the availability of virtual services. Instead, the caseworker who preceded Blaylock continued to meet with Father and Mother.

Blaylock explained that both parents were given a family services plan. Among other things, the plans required Father and Mother to complete a psychosocial evaluation, complete parenting classes, verify their housing and employment, and refrain from criminal activity. Father and Mother completed some but not all services. For example, Father and Mother provided an apartment lease.

7

And they both participated in the individual counseling recommended after their psychosocial evaluations. But neither received a successful discharge from counseling because they would not talk about why the children came were removed and thus did not address the risk to the children. They also did not complete parenting classes, even though Blaylock verified the classes were available in jail. And even though they consistently participated in visits with the children, Father and Mother were overwhelmed during the visits, struggled to control Nancy and Kate, and had limited interaction with the triplets.

Blaylock testified that each child needed some services when they entered the Department's care. For example, Nancy, age three, entered the Department's care without physical injury but was developmentally delayed, still drinking formula, did not speak, and needed several therapies (speech, play, physical, and occupational). Kate, age two, also was developmentally delayed, still drinking formula, and needed many of the same therapies. She also was recommended for but had not yet been tested for autism.

As for the triplets, David was the only one healthy enough to go straight to a foster care placement. Michael, not yet one, was "extremely fragile" and malnourished. Because he had nearly fatal injuries, he needed time and various therapies (speech, feeding, occupational, and therapy). The right side of his brain was "completely dead," affecting movement on the left side of his body. Through

therapy, he was learning how to use his mouth and swallow. He needed medication to prevent seizures and a brace to walk. Evan was also malnourished, at risk for seizures, and needed the same therapies as Michael. In Blaylock's view, Father and Mother did not understand the children's needs.

Blaylock also testified that the children were placed in two foster homes—Nancy and Kate in one home and the triplets in another home nearby. Both placements are adoptive, and the children have bonded with their respective foster families. None of the children have sustained additional fractures since being placed in the foster home. The Department believed termination of the parent-child relationship was in the children's best interest because they were all making significant progress, none had broken any bones since being placed in foster care, and the parents' incarceration and criminal charges prevented them from providing a safe and stable home for the children.

Nancy and Kate's foster mother testified that the girls were thriving, receiving appropriate therapies, meeting developmental milestones, and doing well in school. The triplets were also making progress. They arrived in their foster home at different times, as they were released from the hospital. Their foster mother explained that David arrived first because he did not have injuries. David was "really tired" and "smelly" and had "long nails" and a "flat head." He was developmentally delayed and, at nine months, could not sit up or pull himself up. Evan arrived next and

seemed more like a newborn. He was small, at 12 pounds, and had no mobility. The triplets' foster mother described Evan's body as asymmetrical because his bone fractures had not healed properly. When Michael arrived last, he was "always in pain, always crying, . . . an angry baby, just in so much discomfort." He could not move his head. His hearing and eyesight were diminished, and he was emotionally unstable because of the traumatic brain injury. But the foster family was meeting the triplets' significant needs, and the triplets' condition was improving.

After closing arguments, the trial court terminated Father's and Mother's parental rights on four predicate grounds—Subsection (D) (endangering conditions), Subsection (E) (endangering conduct), Subsection (N) (constructive abandonment), and Subsection (O) (failure to comply with the court-ordered family services plan). *See* TEX. FAM. CODE § 161.001(b)(1)(D)–(E), (N)–(O). Under Subsection (O), the trial court found that neither Father nor Mother proved by a preponderance of the evidence that they made a good-faith effort but could not comply with specific provisions of the family services plan through no fault of their own. *See id.* § 161.001(d). The trial court also found that termination of Mother's and Father's parental rights was in the children's best interest, and it appointed the Department as the children's permanent managing conservator.

Both Father and Mother appealed.

**Father's Appeal**

In his first through fourth issues, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of the predicate grounds for termination under Subsections (D), (E), (N), and (O). *See* TEX. FAM. CODE § 161.001(b)(1)(D)–(E), (N)–(O). And in his fifth issue, Father challenges the legal and factual sufficiency of the trial court's finding that termination of his parental rights was in the children's best interest. *See id.* § 161.001(b)(2).

## A. Standard of review and applicable law

A parent's rights to the "companionship, care, custody, and management" of their children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers as to the parent-child relationship, except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and construe the involuntary termination statutes in the parent's favor. *Id.* But parental rights "are not absolute" and "are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, we focus on protecting the child's best interest. *See id.*

Because of the severity and permanency of the termination of parental rights, the evidence supporting termination must meet the threshold of clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This is an intermediate standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam).

This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). When the legal sufficiency of the evidence supporting termination is challenged, we review the evidence in the light most favorable to the termination finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.F.C.*, 96 S.W.3d at 266. If, after conducting a legal sufficiency review of the record evidence, we determine that no reasonable factfinder could have formed a firm belief or conviction

12

that the matter to be proved was true, we must conclude that the evidence on that matter is legally insufficient. *Id.*

Only when the factual sufficiency of the evidence is challenged do we review disputed or conflicting evidence. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and will substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter of witness credibility and demeanor. *Id.* at 109. We will not second-guess the "resolution of a factual dispute by relying on evidence that is either disputed, or that [the factfinder] could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003). The reviewing court should "explain in its opinion 'why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.'" *In re J.O.A.*, 283 S.W.3d at 345.

A single predicate ground under Section 161.001(b)(1) of the Family Code supports a judgment of termination when there is also a finding that termination of the parent-child relationship is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362. If the factfinder finds multiple predicate grounds, we may affirm on any one ground. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.]

2013, no pet.). But when termination is ordered under predicate ground (D) or (E), we must review those grounds because they can supply the predicate for future terminations. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (due process mandates appellate review of Subsection (D) and (E) findings when the issue is preserved, even if the termination could be affirmed on another ground); *see also* TEX. FAM. CODE § 161.001(b)(1)(M) (allowing termination if parent has had rights terminated with respect to another child under Subsection (D) or (E)).

**B.     The evidence is legally and factually sufficient to support termination of Father's parental rights under Subsection (E) for endangering conduct.**

The trial court found that Father's conduct violated predicate ground (E). Under Subsection (E), a court may order termination of a parent's rights if he has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Subsection (E) thus focuses on the parent's conduct—acts, omissions, or failures to act—and whether the evidence shows that the child's physical or emotional well-being was endangered because of such conduct. *D.H. v. Tex. Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 59 (Tex. App.—Austin 2021, no pet.).

Within the context of Subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

14

To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The factfinder may infer specific danger to the child's well-being from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533.

More than a single act or omission must support termination of a parent's rights. *D.H.*, 652 S.W.3d at 59. The evidence must show the parent's "voluntary, deliberate, and conscious course of conduct." *Id.*; *see also In re M.A.J.*, 612 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g). In determining whether the parent engaged in endangering conduct, the factfinder may consider conduct that occurred before and after the child was born, conduct in the child's presence and outside the child's presence, and conduct before and after the child was removed from his parent's custody. *In re J.O.A.*, 283 S.W.3d at 345; *In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied).

Father argues the trial court's Subsection (E) finding cannot be sustained because the evidence showed only that Michael and Evan were injured and not how they were injured or by whom. He asserts that no evidence shows that he engaged in any endangering conduct—much less a voluntary, deliberate, course of conduct— that caused the children's physical injuries. He did not have a history of violence, no one saw him abuse the children, and he was supportive of the children receiving medical care. We disagree.

15

Father does not dispute that when Michael was admitted to the hospital in September 2022, doctors discovered that he had several physical injuries that were in different stages of healing. Evidence admitted at trial confirmed the serious nature of the injuries. The Department caseworker testified that the injuries were nearly fatal. And medical records described "fractures all over [Michael's] body," including multiple fractures to his skull, with "associated scalp hematomas" and subdural hemorrhaging along "the right parietal and occipital lobes" of his brain. Michael also had multiple rib fractures, a fractured right femur, two "intra retinal hemorrhages" in his left eye, and "too-numerous-to-count multi-layered retinal hemorrhages" in his right eye. Based on their findings and experience, doctors concluded that Michael's injuries were not self-inflicted or attributable to "a medical condition or disease process," but were the result of "multiple episodes of significant trauma." The medical records explained:

- subdural hemorrhaging like Michael suffered may be caused by "a whiplash type of injury, impact injury of the head against the surface, or a combination of the two, with rapid deceleration of the brain inside the skull";

- bilateral and muti-layer retinal hemorrhages may be caused by "violent acceleration-deceleration forces on [Michael's] head";

- skull fractures occur when "there is a blunt force trauma applied to the skull or when the skull strikes a stationary object";

- the presence of an oblique fracture likely showed "the application of twisting force to [Michael's right] leg"; and

16

- the posterior rib fractures were "highly specific for inflicted injury" and may be caused by "a compression (squeezing) type force applied to [Michael's] chest or by blunt force trauma."

The doctors rejected the possibility that a child would have the strength to inflict such injuries. Moreover, the discovery of Michael's injuries caused Evan to be examined. And that examination led to findings that Evan too was a victim of child abuse because he had broken bones in various stages of healing in his ribs, arms, legs, and skull.

From this evidence the trial court could reasonably conclude that the Michael and Evan sustained serious, nonaccidental injuries. *See In re J.F.-G.*, 627 S.W.3d at 312 (stating that "endanger" means "to expose to loss or injury; to jeopardize") (citation omitted). That the injuries were in varying stages of healing is significant evidence that the injuries did not occur all at once and resulted from ongoing mistreatment. *In K.H.G.*, No. 01-23-00675-CV, 2024 WL 1098202, at *10 (Tex. App.—Houston [1st Dist.] Mar. 14, 2024, no pet.) (mem. op.) (considering evidence of child's multiple serious injuries that were in varying stages of healing as "significant evidence" that "injuries resulted from a voluntary, deliberate, and conscious course of action, not from a single act or omission.").

We disagree that there is insufficient evidence that Father's conduct caused the injuries. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *D.H.*, 652 S.W.3d at 59 (stating that Subsection (E) focuses on parent's conduct—including acts, omissions,

or failures to act—and whether child's well-being was endangered as direct result of parent's conduct). "A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause[.]" *In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) (applying rule in affirming termination under Subsection (E)); *see also In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (applying rule to termination under Subsection (D)). Trial testimony established Father and Mother as the children's sole caregivers. Father testified that he and Mother shared in the children's care and no other person served as a caregiver. Mother testified that she did not invite other people to the family home because of the triplets' delicate condition after being born prematurely. And the children had not suffered any more broken bones since entering the Department's care. The record thus supports a reasonable inference that the injuries occurred when the children were with Father or Mother or both. *See In re K.H.G.*, 2024 WL 1098202, at *10 (affirming termination under Subsection (E) where child had multiple serious injuries that were unexplained and only mother and father had opportunity to cause injuries as child's sole caregivers).

Although Father and Mother offered alternative explanations for the injuries—the triplets' vulnerable condition because of premature delivery by cesarean section, rough play from an older sibling, a fall, or a hereditary bone

18

disease—the trial court was free to disbelieve those theories. *In re H.R.M.*, 209 S.W.3d at 109 (appellate courts must defer to trial court's credibility assessments). From the evidence, the trial court could reasonably conclude that Father either physically abused Michael and Evan or failed to protect them from Mother's abuse, resulting in serious injuries to both children. *See id.*; *In re E.J.Z.*, 547 S.W.3d at 350. The trial court was also permitted to consider Father's endangerment of Michael and Evan as support for endangerment of the other children. *See In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.) ("If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment.").

We therefore conclude that, when viewing the evidence in the light most favorable to the trial court's Subsection (E) finding and considering undisputed contrary evidence, the trial court could have formed a firm belief or conviction that Father engaged in conduct or knowingly placed the children with Mother who engaged in conduct that endangered their physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). We therefore hold that the evidence was legally sufficient to support termination of Father's parental rights under Subsection (E).

Considering the entire record, we also conclude that the disputed evidence contrary to the trial court's Subsection (E) finding is not so significant that it requires

19

a different result. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We therefore hold that the evidence was factually sufficient to support the termination of Father's parental rights under Subsection (E).

And because the evidence was legally and factually sufficient to support termination of Father's parental rights under Subsection (E), we need not separately address the other predicate grounds for termination. *See In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1 (court to issue opinion that is as brief as practicable but addresses every issue raised and necessary to final disposition of the appeal). We overrule Father's second issue and do not reach his first, third, and fourth issues challenging the other grounds for termination.

## C. The evidence is legally and factually sufficient to find that termination of Father's parental rights is in the children's best interest.

Father also challenges the trial court's finding that termination of his parental rights is in the children's best interest. TEX. FAM. CODE § 161.001(b)(2). Along with a predicate violation, a party seeking to terminate another's parental rights must show by clear and convincing evidence that termination is in child's best interest. *Id.* The best-interest prong of the termination inquiry is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and

20

permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

A factfinder may consider several factors to determine a child's best interest:

- the desires of the child;

- the present and future physical and emotional needs of the child;

- the present and future emotional and physical danger to the child;

- the parental abilities of the persons seeking custody;

- the programs available to assist those persons seeking custody in promoting the best interest of the child;

- the plans for the child by the individuals or agency seeking custody;

- the stability of the home or proposed placement;

- acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.* at 372; *In re D.R.A.*, 374 S.W.3d at 533. But the lack of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). In some cases, undisputed evidence of only one factor may be enough to support a finding that termination is in the child's best interest; in other

cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *Id.*

In addition, the Family Code sets out factors for evaluating the parent's willingness and ability to provide the child with a safe environment, including:

- the child's age and physical and mental vulnerabilities;

- whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

- the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

- the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time;

- whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and

- whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds can also be considered in support of a finding that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). A parent's past

conduct is probative of future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *Jordan*, 325 S.W.3d at 724. A factfinder may infer that past conduct endangering the child's well-being may recur if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.); *Jordan*, 325 S.W.3d at 724.

Father contends that no rational factfinder could have formed a strong conviction or belief that severing the parent-child relationship was in the children's best interest. He points to evidence that, before the children entered the Department's care, he was meeting their needs by feeding and diapering them, playing with them, providing them with stable housing, paying for medical insurance that allowed the children to see a pediatrician regularly and receive their vaccinations.

The children were too young at the time of trial to express their desires. But their tender age and bond with prospective adoptive parents supports the trial court's best-interest finding. *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (evidence of child's bond with caregiver serves as reasonable proxy for determining desires of a child too young to express them); *In re M.F.*, No. 01-17-00835-CV, 2018 WL 1630180, at *7 (Tex. App.—Houston [1st Dist.] Apr. 5, 2019, pet. denied) (mem. op.) (child's young age weighed in favor of best-interest finding).

The triplets have been in the same foster home for much of their lives—Michael and Evan since they were released from the hospital, and David a little longer because no injuries delayed his placement. The triplets are bonded with their foster family, and the foster family is willing and able to adopt them. The foster family received training to meet Michael's special needs and has provided consistent, loving, and stable care. The foster family is also supportive of the triplets maintaining a relationship with their sisters Nancy and Kate, who are thriving in a nearby adoptive placement. The Department's caseworker described Nancy's and Kate's progress in their foster home as "awesome." And contrary to Father's suggestion, the evidence of alternative family placements for the children does not weigh heavily against the trial court's best-interest finding. *See In re L.M.*, 572 S.W.3d 823, 827 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("A child's anticipated placement is a factor in determining the child's placement, but the fact that placement will be with non-relatives is not a bar to termination.").

The evidence that Father engaged in an endangering course of conduct is also support for the trial court's best-interest finding. *See In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at \*4 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) ("Evidence establishing one of the predicate acts under [TEX. FAM. CODE §] 161.001[(b)](1) may also be relevant to determining the best interest of the child."). The evidence showed that while the children were in Father's

care, Michael and Evan, still infants and immobile, sustained multiple serious injuries, including fractures to their skulls, ribs, arms, and legs, which doctors found resulted from nonaccidental, inflicted trauma. Father denied any responsibility for the injuries. And while he scored in the average to positive range in a parenting inventory, he described Michael's and Evan's injuries as "small fractures on their arms." The Department's caseworker testified that Father underestimated the seriousness of the injuries and did not seem to appreciate the significant level of care Michael and Evan would require in the long term.

Additionally, at ages three and two, Nancy and Kate entered the Department's care with significant developmental delays, which Mother and Father did not acknowledge. Nancy and Kate could not speak, had not been potty trained, were still being fed with bottled formula, and required multiple interventions, including speech, occupational, and physical therapy.

Other evidence cast doubt on Father's ability to parent the children. At the time of trial, Father was incarcerated on criminal charges arising from Michael's and Evan's injuries. Although Father made some progress on his family services plan before and despite his incarceration, he did not complete the services required to address the concerns that brought the children into the Department's care. The Department caseworker testified that Father was unwilling to talk about how the injuries to Michael and Evan occurred in individual counseling and thus had not

25

alleviated the Department's concerns about the possibility of future injury to the children. And during visits, Father seemed overwhelmed by the children and had little interaction with the triplets.

We agree with the Department that, viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering any undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that terminating Father's parental rights was in the children's best interest. Considering the entire record, we conclude that the disputed evidence that a reasonable factfinder could not have credited for the best-interest finding is not so significant that the factfinder could not have formed a firm belief or conviction that it is true. Thus, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding on Father. *See In re A.C.*, 560 S.W.3d at 630–31.

We overrule Father's fifth issue.

### Mother's Appeal

After appealing the trial court's termination order and filing her opening brief in this Court, Mother moved to voluntarily dismiss her appeal. *See* TEX. R. APP. P. 42.1(a)(1). The motion includes a certification that no party opposes it. The motion is therefore granted, and Mother's appeal is dismissed.

## Conclusion

We dismiss Mother's appeal. And having overruled the issues that are necessary to resolve Father's appeal, we affirm the trial court's termination order.

 

 

 

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.