**AFFIRMED and Opinion Filed December 9, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-19-00709-CV**
**No. 05-19-00711-CV**

**IN THE INTEREST OF I.S. AND S.S, CHILDREN**
**IN THE INTEREST OF J.L., JR., J.L.L., AND J.M.L., CHILDREN**

**On Appeal from the 254th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. DF-14-10695-R and DF-17-19273-R**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Whitehill, and Justice Molberg
Opinion by Chief Justice Burns

These appeals follow the trial court's judgments terminating the parental rights of (1) appellant, M.T. (Mother), to five of her six her children and (2) appellant, J.L., Sr. (Father), to his three children. Mother and Father challenge the sufficiency of the evidence to support the findings that they engaged in the two alleged grounds for termination. Additionally, Mother challenges the sufficiency of the evidence to support the findings that termination was in the children's best interest and that the Department of Family and Protective Services (the Department) should be appointed the children's permanent managing conservator. For the reasons that follow, we affirm the trial court's judgments.

## BACKGROUND

The children at issue are I.S., born August 2007; S.S., born January 2013; J.L., Jr., born September 2014; J.L.L., born September 2015; and, J.M.L., born July 2017. As reflected in the

chart below, I.S. and S.S. were born to Mother and J.S,[1] who were together from 2007 until 2013, and J.L., Jr., J.L.L, and J.M.L. were born to Mother and Father, who have had an "off and on" relationship since 2014.



## I.        The Family's History with the Department

The incident that led to the Department filing suit to terminate Mother's and Father's parental rights occurred in September 2017, but Mother's and Father's history with the Department began long before then. Mother's history began in 2004 when the Department received a referral regarding her drug use and neglect of her first child, not one of the children identified above.[2] Mother tested positive for cocaine, but did not believe she had done "anything wrong" or that the Department should have been involved. She refused to participate in services that would have addressed the concerns leading to the referral, and the child was permanently placed with Mother's father.

Five years later, the Department received another referral. This referral alleged neglectful supervision of I.S. by Mother based on burns on I.S.'s forearm from an unattended curling iron.[3] At the time, I.S. was a year old. During the Department's investigation of this allegation, Mother and I.S. tested positive for amphetamines, with I.S. testing at a higher level than Mother. Mother also admitted smoking marijuana. The Department, concerned about Mother's decision-making

---

[1] J.S.'s rights to his children were terminated in the same decree as Mother and Father's. He is not a party to this appeal.

[2] According to Mother, the father of this child was not a part of the child's life.

[3] The referral also alleged neglectful supervision by J.S.

and drug use, removed I.S. from the home and offered Mother services. Mother completed the services and the Department, believing she had made the necessary changes to provide a safe environment for I.S., returned I.S. home.

Between 2014 and 2016, the Department received four more referrals on Mother for neglectful supervision. These referrals also alleged neglectful supervision by Father and stemmed from Father's violent character. At least two of the referrals stemmed from incidents of domestic violence between Mother and Father, one of which occurred while Mother was pregnant with J.L., Jr. in 2014 and resulted in Father's arrest and order prohibiting him from having any contact or communication with Mother.[4] Following each referral, the Department offered Mother and Father services to keep the family intact. The Department also offered therapy to I.S. following the last referral.

## II.     The September 2017 Referral

The Department received the referral that led to this suit after Mother took two-month-old J.M.L. to the hospital with a fractured femur. Neither Mother nor Father could explain how J.M.L. was injured, resulting in the removal of the children. At the time, I.S. was ten, S.S. was four, J.L., Jr. was three, and J.L.L. was two.

Mother and Father were again provided services and, over the course of the next fifteen months or so, submitted to random drug and alcohol testing and completed parenting classes, psychological and psychiatric evaluations, and individual counseling. Father also completed a batterer's intervention program. However, believing neither of them had made sufficient progress and changes, the Department pursued termination.

---

[4] Father confessed to assaulting Mother. A copy of his "Judicial Confession" was admitted into evidence and recites he struck Mother with his hand and comb and squeezed her neck with a belt. The confession also recites that prior to the assault, he had been convicted in 2010 of another assault against a family and household member "with whom he had a dating relationship" and been convicted of the felony offense of possession of a controlled substance with the intent to deliver.

## III.    The Trial

The case was tried to the bench over a three-day period.  Based primarily on Mother's relationship with Father and Father's violent nature, the Department asserted Mother's and Father's rights should be terminated on the grounds that their conduct and home environment endangered the children's well-being.  *See* TEX. FAM. CODE ANN. § 161.001(D), (E).  In support, the Department called as witnesses two of its caseworkers, Mother's and Father's counselors, I.S. and S.S.'s counselor, and the relatives with whom the children had been placed.

Department caseworker Kayla Landry testified she investigated the referral concerning J.M.L. and familiarized herself with the facts of the other cases.  Although she was unable to determine how J.M.L. was injured, she learned from interviews with Mother and Father that J.M.L. had started "crying continuously" while in Father's care the night before she was taken to the hospital.  Mother and Father were living separately at the time and the children were with Father for the weekend.  When J.M.L. would not stop crying, Father took her back to Mother, who observed the injury the next day during a diaper change.  Landry testified the police were called, but no charges were filed against either parent.

Landry provided affidavits in support of the filing of the suit and removal of the children.[5] The affidavits chronicled the steps she took during her investigation and summarized Mother's and Father's backgrounds and their history with the Department.  Although the affidavits were not admitted into evidence, she testified concerning certain statements in her affidavits.  She noted that the affidavits recited that Father had been arrested in 2014 for "impeding Mother's breath," and the assault occurred in the presence of I.S., who was six at the time, and S.S., who was one.  The affidavits also recited that the first of two 2014 referrals was "closed" after Mother ended her

---

[5] The physician who examined J.M.L. at the hospital also provided an affidavit.  Landry's and the physician's affidavits were attached to the Department's petition for termination.  The trial court took judicial notice of the case files, but the affidavits were not separately admitted into evidence.

relationship with Father and the second was "ruled out" because a protective order was in place preventing Father from living in the house and being around the children. Landry testified that Mother and Father were offered services throughout and that Father completed a batterer's intervention program in 2015. Landry expressed concern about Father's violence towards Mother and noted that, despite Father completing a batterer's intervention program, he still engaged in domestic violence with Mother.

Tara Harris, the "ongoing" or conservatorship caseworker, testified she began working with Mother, Father, and the children after Landry had concluded her investigation. She explained the Department's goal is to reunify families, and the services offered to parents are intended to "provid[e] parents with some type of education to kind of rebuild the foundation." However, completion of services alone is not sufficient for reunification. Harris explained that parents must demonstrate "the necessary environmental and behavioral changes," and that a parent's progress is assessed on a monthly basis.

Based on her assessments of Mother and Father, Harris did not believe they had made the necessary changes. Specifically, as to Mother, Harris opined Mother had not accepted responsibility for the children being removed from the home and remained "on the defense" when discussing the domestic violence and home environment. Asked if Mother had endangered the children, Harris replied she had by "going back to" Father. Harris referenced the referrals between 2014 and 2016 and expressed concern that even after Father assaulted Mother in 2014, Mother had two more children with Father. Harris worried Mother would again reunite with Father and, if the children were returned to her, they would be subjected to the same lifestyle that initiated this case. Harris did not believe Mother had the ability to provide a safe and stable home for the children and felt Mother had either not learned from the services she had completed multiple times or struggled to apply what she had learned.

Turning to Father, Harris believed termination was proper because Father committed violence in Mother's home in the children's presence and that impacted the children. Additionally, Father had an extensive criminal history that began in 2003 that included, in addition to assault family violence, convictions for possession with intent to deliver a controlled substance.[6] In Harris's opinion, Father's parenting abilities were limited, and he could not meet the children's emotional and physical needs. Harris noted Father had "several" outbursts in court, used profanity towards I.S. and S.S.' grandmother, was verbally aggressive towards her and the children's attorney ad litem, and was not receptive to suggestions and advice. Harris testified the Department had offered all the services it could multiple times to Mother and Father and had no more programs to assist them.

Asked about the children, she noted I.S. and S.S. were living with their paternal grandmother, and J.L., Jr., J.L.L., and J.M.L. were living with their paternal aunt. All children were thriving, and their level of anxiety had decreased tremendously. Harris believed children need a safe and stable home, and believed it was in the children's best interest to terminate Mother's and Father's parental rights because they could not provide that to the children but Grandmother and Aunt could. Harris noted both Aunt and Grandmother had expressed difficulties co-parenting with Mother and Father and noted further that, for almost a year, Mother refused to contact I.S. and S.S. or attend their activities.

Christi Rogers, I.S. and S.S's counselor, also testified children need safety and stability. She believed children who live in an environment where domestic violence exists generally experience many negative effects and have a greater chance of repeating the domestic violence cycle. According to Rogers, both I.S. and S.S. witnessed Mother and Father "fighting." I.S. had also seen Father choke and hit Mother in the face. Rogers testified S.S. would hide in another

---

[6] Copies of Father's criminal records were admitted into evidence.

room when Mother and Father "fought," and I.S. talked to her about how she feared returning to Mother's home because Father might be there. Both girls had "experienced trauma" in the home and suffered with anxiety. By contrast, the girls felt safe in Grandmother's home, and Rogers felt Grandmother was the "main person for them that is able to calm them down or to be of support." Rogers testified the girls told her they wished to remain with Grandmother, and she worried a return home would be detrimental to the children.

Father's counselor, Crystal Walker, met with Father for twelve sessions. She testified Father reported to her that this was his first case with the Department and admitted to using marijuana and "fighting" with Mother. In her opinion, Father minimized the "fighting." She believed that the "fighting" was "very much domestic violence," and counseled him on the impact domestic violence has on children and on identifying triggers that "fuel" the reactive behaviors. She explained to him that domestic violence makes children very fearful and distrustful and causes emotional instability and uncertainty. She believed he understood the impact, but expressed concern that he would continue to be abusive if he and Mother were together. She also expressed concern about the children being returned to him based on the injury to J.M.L. not being explained.

Mother's counselor, Betty Cannon, testified Mother was "very active" in counseling and had taken several steps to show the children should be returned to her. For example, she had maintained employment and obtained appropriate housing. She had also made plans for day care. However, Cannon did not believe the children should be returned to Mother because she did not think Mother could protect either herself or the children from Father and did not trust Mother's ability to make appropriate decisions for the children.

Cannon testified her goal in the counseling sessions was to help Mother gain insight into what domestic violence is and how children are emotionally affected by it. However, while Mother admitted Father called her names, pushed her, and hit her, she denied she was a victim of domestic

violence, justified Father's actions and accepted blame for them, and would not accept the role the domestic violence played in this case. Cannon further testified that Mother wanted to co-parent with Father and believed he was a good parent, would not hurt the children, and needed to be with the children. Cannon noted that Mother shifted the blame for her children's removal and trauma away from the domestic violence and onto the Department. In her opinion, Mother's thinking was distorted and prevented her from making appropriate decisions. She believed Mother's visits with the children should be supervised and Father should have no contact with them or Mother. Cannon also noted that she observed several of Mother's visits with her children and questioned the genuineness of her bond with them.

Aunt, with whom J.L., Jr., J.L.L., and J.M.L. were placed, testified she has two sons of her own, a sixteen-year old and a three-year old. She was unaware of the Department's involvement with Mother and Father until almost a year after J.M.L. was taken to the hospital. She explained she and her family had "disconnected" from Father before J.L.L. and J.M.L. were born because of his aggression and because he had taken a cousin "to get drugs." Father, however, called her in June 2018 asking for help, and she offered to take the children. At the time, the children were in foster care.

Aunt testified J.L., Jr. and J.L.L. were in Head Start and learning "social skills" and "self-sufficien[cy]" – "things . . . they could have been taught" at home but were not. She described J.L.L. as a "social butterfly" and eager to learn, and observed J.L.L. had become calmer and more confident since being placed with her. Aunt testified J.L., Jr. acclimated well, but was aggressive with J.L.L. She noted that when the children were first placed with her, neither Mother nor Father were visiting. At some point, though, they began visiting and J.L., Jr.'s aggression towards J.L.L. increased. J.L., Jr. also began having behavioral issues in the classroom. Aunt communicated this to Harris, the "ongoing" caseworker, and J.L., Jr. began receiving therapy immediately.

Aunt testified her sons and the children got along well, and she took the children to visit I.S. and S.S. at least once a month. She testified further that she loved the children, was committed to them, and hoped to adopt them. She had support from her family as well as from Fostering Connections, a program helping her prepare for the long-term care of the children. She believed termination of Mother's and Father's rights was in the children's best interest. She described Father as "physically," "emotionally," and "mentally" aggressive, even with her, and noted she had to block his calls on her cell phone as a result. Father was also resistant to advice, not wanting anyone to "tell him" how to raise his children. She described Mother as "uncooperative" with her and submissive to Father. Although Aunt never witnessed Father being violent with Mother, she witnessed Father lock a former girlfriend in the trunk of his car, and Mother called her many times crying because of the way Father treated her. Aunt believed Mother and Father were back together, as Father had called her a few times from Mother's cell phone, and she worried for the children if this were the case. She also worried that if Father "was in the picture," he would impede the progress the children had made. She was not willing to allow Mother or Father to visit post-termination but was willing to supervise phone calls between them and the children, keep them informed about the children, and send them pictures.

Grandmother testified I.S. and S.S. were placed with her and her husband in October 2017. She and her husband were willing to have J.L., Jr., J.L.L., and J.M.L. placed with them also, but Mother and Father refused.

Grandmother described the girls as "fragile" when they first came to her. I.S. had nightmares and was "always looking out the window, thinking [Father] was coming to the house." There was some concern she wanted to harm herself. S.S., who was four at the time, wanted to sleep in Grandmother's room. Both girls needed the light on. With therapy and a loving and

secure home environment, however, the girls were improving and the concern that I.S. wanted to harm herself no longer existed.

Grandmother testified she and her husband were committed to the girls long-term, the girls wanted to stay with them, and they hoped to adopt. She believed termination of Mother's rights was in the girls' best interest and explained that I.S. had been telling her about the violence at home for the past several years.[7] According to Grandmother, I.S. had witnessed Father beating Mother and, on one occasion, when I.S. was about eight years old, Father beat I.S. on the hand with a belt causing bleeding and leaving cuts. Grandmother did not believe Mother put the girls' needs first or protected them, based on Mother's relationship with Father and other abusive men, and expressed concern the girls would be exposed to more violence if they were returned to Mother. Grandmother noted the girls did not say they missed Mother and did not always talk to her on the phone. If Mother's rights were terminated, Grandmother would allow supervised visits and phone calls with Mother but would want a no-contact order with Father. Grandmother would also continue the visits with J.L., Jr., J.L.L., and J.M.L.

Mother and Father also testified and called their own witnesses. Mother discussed the various referrals and her relationship with Father. She thought she had learned from the parenting classes and counseling she had received and noted, as an example, that she felt she was more attentive to and open with her children during visits. She acknowledged she had made mistakes but believed she had learned from them. Although she knew the children were well cared for with Grandmother and Aunt, she wanted them returned to her and thought she was a great mother. She noted she had beds for the children in her apartment,[8] had a car to take them to school, and had the

---

[7] Before the Department became involved in September 2017, Grandmother and her husband had filed suit to obtain custody of the girls. Grandmother testified she and her husband sought custody based on "all the violence [the girls were] seeing and going through at home." She and her husband nonsuited their suit after the Department became involved.

[8] Pictures of her apartment were admitted into evidence.

support of her grandmother and best friend. She believed she could protect and nurture them and, having seen the children benefit from counseling, planned to continue counseling for them. Asked about Father, she described him as good with the children and noted in a letter she wrote to the trial judge following Father's arrest for assaulting her in 2014, that I.S. and S.S. loved him.[9] In her opinion, Father should have unsupervised visitation with the children, and she wanted to co-parent with him. As for Father's treatment of her, she offered contradictory testimony, admitting at times he had pushed and hit her and denying any abuse at other times. She acknowledged knowing Father had been violent with other girlfriends but never discussed it with him.

Two of Mother's friends testified that Mother was a great parent and they had no concerns about the children being with her or Father. Although they generally knew about the 2014 assault for which Mother was hospitalized and Father was arrested, they did not know the details.

Father admitted to his criminal record and said he had smoked marijuana in the past, most recently about fourteen months before trial and a year after the children were removed. He denied locking his former girlfriend in the trunk and assaulting Mother in 2014, but admitted his fighting with his partners in the past included "being physical." He testified he did not understand at the time that the children were affected by "physical fighting," but understood now and was no longer "physical." He testified he loved his children and offered into evidence pictures and videos of him singing and interacting with them. He believed he had changed his lifestyle, noting he had not been charged with any crimes since J.L., Jr. was born. In his opinion, Mother was a good parent and the children should be returned to him and her.

Father also called his employer, who testified he was a hard worker and got along well with others; Betty Livingston, who monitored Father's visits with J.L., Jr., J.M.L., and J.L.L. and

_____

[9] The letter was admitted into evidence and asked the trial judge "to show leniency." In the letter, Mother stated Father was good to I.S. and S.S. and denied he was violent. She stated the "situation got out of hand and was exaggerated [due] to [her] being angry and emotional."

–11–

testified she found him loving towards the children and the children loving towards him; Natalie Andrews, his drug counselor who found him to be respectful and testified he did not test positive for drugs while in therapy with her; and his girlfriend, who testified she was aware of his violent past but did not see him as emotionally or physically abusive and had no concerns with her child being around him.

The children's attorney ad litem called the final witness, the children's court-appointed special advocate (CASA). The CASA described I.S. and S.S. as reserved and scared when he first met them but had seen an "incredible change" in them since. He attributed the positive change to the girls feeling safe and being in a "better place" with Grandmother.

As for J.L., Jr., J.L.L., and J.M.L., he noted that they were placed in different foster homes at the beginning because Mother and Father would not agree to them being placed with Grandmother. While J.M.L. remained in the same foster home until being placed with Aunt, J.L.,[10] Jr. and J.L.L. were moved to different homes a few times. As a result, they struggled more. However, the CASA saw "dramatic stabilization, comfort level" in J.L., Jr. and J.L.L. when they were placed with Aunt. Asked about Mother and Father, the CASA testified he had observed them three or four times with the children and found Father quite involved while Mother was inattentive. He concurred with the Department's recommendation that their rights be terminated to allow Grandmother and Aunt to adopt and provide permanency for the children, noting he was concerned that Mother's and Father's counselors did not feel either had made significant changes.

Finding the Department satisfied its burden of proof, the trial court found Mother's and Father's conduct and home environment endangered the children's well-being under subsections 161.001(b)(1)(D) and (E) of the family code and that termination of their parental rights was in

---

[10] The record reflects J.M.L. suffered a fracture to her tibia while in foster care. The record is not clear how it occurred but testimony suggested it was a result of a medical condition.

the children's best interest.  *See* FAM. CODE. § 161.001(b)(1)(D),(E), (2).  The trial court further found appointing the Department as permanent managing conservator of the children would be in the children's best interest.

**SUFFICIENCY OF THE EVIDENCE TO SUPPORT TERMINATION**

Mother's first two issues and Father's sole issue assert the evidence is legally and factually insufficient to support the trial court's finding that they engaged in the two alleged grounds for termination.  In a third issue, Mother also asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the children's best interest.

## I.     Standard of Review

Because the natural right existing between parents and their children is of constitutional dimensions and termination of parental rights "is complete, final, [and] irrevocable," termination proceedings are strictly scrutinized and require clear and convincing evidence in support.  *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  As defined by the family code, "clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *See* FAM. CODE § 101.007; *see also In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam).

When reviewing legal sufficiency in a parental termination case, we look at the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true.  *See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We will conclude the evidence is legally sufficient if a reasonable factfinder could have formed such a firm belief or conviction.  *See In re A.C.*, 560 S.W.3d at 631.  In conducting our review, we assume the factfinder resolved disputed facts in favor of its finding, if a reasonable

factfinder could have done so, and disregard all evidence a reasonable factfinder could have disbelieved or found to be incredible. *See In re J.F.C.*, 96 S.W.3d at 266.

By comparison, when reviewing factual sufficiency in a parental termination case, we weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* We will conclude the evidence is factually sufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is not so significant as to preclude the factfinder from forming a firm belief or conviction that the finding was true. *See id.*

## II.  Statutory Grounds for Termination

A court may terminate a parent-child relationship upon a finding by clear and convincing evidence that (1) the parent engaged in an act prohibited by section 161.001(b)(1) of the family code and (2) termination is in the best interest of the child. FAM. CODE § 161.001(b). Though evidence may be relevant to both elements, each element must be proven, and proof of one does not relieve the burden of proving the other. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

The two statutory grounds for termination alleged against Mother and Father by the Department, and found by the trial court, were subsections 161.001(b)(1)(D) and (E). Subsection (D) addresses the child's surroundings and environment, allowing for termination upon clear and convincing evidence that the parent knowingly placed or allowed the child to remain in an environment which endangered the child's physical or emotional well-being. FAM. CODE § 161.001(b)(1)(D); *In re J.D.B.*, 435 S.W.3d 452,463 (Tex. App.—Dallas 2014, no pet.). Subsection (E) addresses parental misconduct, allowing for termination upon clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the child's physical or emotional well-being. FAM. CODE

§ 161.001(b)(1)(E); *In re J.D.B.*, 435 S.W.3d at 463. For purposes of these two subsections, endangerment means "to expose to loss or injury or to jeopardize" and encompasses instability, uncertainty, and unpredictability. *See In re M.L.L.*, 573 S.W.3d 358, 361 (Tex. App.—El Paso 2019, no pet.); *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.D.B.*, 435 S.W.3d at 463.

An environment is endangering to a child when it presents a potential for danger of which the parent is aware but consciously disregards. *See In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). In this context, environment refers not just to the suitability of the child's living conditions but also the conduct of parents or others in the home. *In re M.L.L.*, 573 S.W.3d at 361. Examples of endangering environments include homes where drug-related activity or violent or abusive conduct occurs. *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); *In re M.L.L.*, 573 S.W.3d at 361; *In re L.E.S.*, 471 S.W.3d at 925. In determining whether a parent knowingly placed or allowed the child to remain in an endangering environment, courts look at the environment as it was prior to the child's removal. *See In re B.M.S.*, 581 S.W.3d 917. A single act or omission is sufficient for a finding that an environment is endangering. *See In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

By contrast, endangering conduct requires more than an isolated act or omission; it requires a voluntary, deliberate, and conscious course of conduct. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). Further, unlike the inquiry as to whether an environment is endangering, an inquiry into whether a parent's conduct is endangering is not limited to the period of time prior to the child's removal. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Conduct occurring after the child is removed by the Department is also relevant. *Id.* The conduct need not be directed at the

child, result in injury to the child, or occur in the child's presence. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Walker*, 312 S.W.3d at 617. Examples of endangering conduct include intentional criminal activity, illegal drug use, and a propensity for violence. *See In re J.O.A.*, 283 S.W.3d. 336, 345 (Tex. 2009); *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (en banc); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App— Houston [14th Dist.] 2003, no pet.).

## III. Best Interest

A strong presumption exists that remaining with a parent is in the child's best interest. *See* FAM. CODE § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *See* FAM. CODE § 263.307(a); *In re K.S.L.*, 538 S.W.3d 107, 115 n.37 (Tex. 2017). In determining whether termination of parental rights is in the child's best interest, evidence establishing one of the statutory grounds under section 161.001(b)(1) may be considered along with factors such as (1) the child's age and physical and mental vulnerabilities; (2) the desires of the child; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child is fearful of living in or returning to the child's home; (5) whether the perpetrator of the harm is identified; (6) the parental abilities of the person seeking custody; (7) the programs available to assist those persons in promoting the best interest of the child; (8) the plans for the child by those individuals or by the agency seeking custody; and (9) the stability of the home or proposed placement. *See* FAM. CODE § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

## IV. Application of the Law to the Facts

### A. Sections (D) and (E)

#### 1. *Mother*

Applying the appropriate standard, we conclude the evidence is legally and factually sufficient to support termination of Mother's parental rights under both subsection (D) and (E). As to subsection (D), the record reflects that at the time the children were removed, the home presented a danger to them. Mother, who had six referrals prior to the one that led to this case, had been in a relationship for about three years with Father, whom she knew had been violent towards other women and who had a criminal history dating back to 2003 that included convictions for intent to deliver a controlled substance. Additionally, J.M.L. had suffered an unexplained fracture to her leg while under the care of Mother and Father, I.S. had experienced a beating by Father on her hand so severe that it caused bleeding and cuts, and Mother had repeatedly been abused by Father in the presence of the children. The emotional impact on the children was evidenced by (i) the level of anxiety the children had at the time of removal, as described by Aunt, Grandmother, I.S. and S.S's counselor, and the CASA; (ii) J.L., Jr.'s aggression towards J.L.L.; and, (iii) concerns that I.S. wanted to harm herself. Moreover, although Mother had received services over the years to address the Department's concerns and Father had been prohibited from having any communication or contact with her, she maintained a relationship with him and continued to expose the children to violence in the home. From this evidence, a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed and allowed the children to remain in an endangering environment. *See* FAM. CODE § 161.001(b)(1)(D); *see also*, *e.g.*, *In re J.L.L.*, 573 S.W.3d 353, 363 (Tex. App.—El Paso 2019, no pet.) (concluding evidence legally and factually sufficient to support termination under (D) where, among other evidence, mother caused child to be around dangerous person); *In re L.E.S.*, 471 S.W.3d at 925 (concluding evidence legally and factually sufficient to support termination under (D) where, among other evidence, record reflected domestic violence between mother and father was long-standing, violence had occurred both prior to and after the child's birth, and mother did

not remove child from violent home); *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (noting unexplained injuries support reasonable inference that child's caregiver knew of injuries and their cause and support termination under subsection (D)); *In re M.V.*, 343 S.W.3d 543, 547 (Tex. App.—Dallas 2011, no pet.) (considering evidence of domestic violence between mother and father and mother's continuing relationship with father in concluding mother knowingly placed or knowingly allowed child to remain in endangering conditions). No undisputed contrary evidence was presented and, while Mother and Father both minimized the abuse and presented testimony from friends who expressed no concerns about them, this evidence was not so significant as to preclude the trial court from terminating Mother's parental rights under subsection (D). *See In re A.C.*, 560 S.W.3d at 631.

As to subsection (E), in addition to the evidence detailed above, the record reflects Mother allowed the children to have unsupervised weekend visitation with Father after she and he separated. Additionally, the record reflects Mother had not made the necessary changes for the children to be returned to her. Harris, the "ongoing" caseworker, and Cannon, Mother's counselor, were of the opinion that Mother had not accepted responsibility for the children being removed from the home and remained "on the defense" when discussing the domestic violence. Harris and Cannon worried Mother would reunite with Father and subject the children to the same lifestyle that initiated this case–violence, instability, and unpredictability. Aunt believed Mother and Father had already reunited and worried for the children for the same reasons as Harris and Cannon. Finally, Mother testified herself that she wanted to co-parent with Father and believed he should have unsupervised visitation with the children. From this evidence a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed the children with persons who endangered their well-being and had engaged, continued to engage, and would continue to engage in a voluntary, deliberate, and conscious course of conduct that endangered the

children's well-being. *See*, *e.g.*, *In re M.L.L.*, 573 S.W.3d at 364 (considering evidence of domestic violence and mother's "on-and-off" relationship with boyfriend in concluding evidence legally sufficient to support termination under (E)); *Walker*, 312 S.W.3d at 617 (recognizing court may consider conduct after removal from home in determining whether a parent's rights should be terminated under (E)); *In re J.O.A.*, 283 S.W.3d at 346 (considering evidence that father had forced mother to leave home because of her drug use and allowed mother to leave with child in concluding evidence legally sufficient to support termination under (E)). Again, no undisputed evidence to the contrary was presented and, while friends expressed no concern about Mother and Father being with the children and Mother testified Father was good with the children, she believed she could protect and nurture them, and she had learned from her mistakes, this evidence was not so significant as to preclude the trial court from terminating Mother's rights for knowingly engaging in conduct and placing the children with persons who engaged in conduct that endangered their well-being. *See In re A.C.*, 560 S.W.3d at 631.

In concluding the evidence is legally and factually sufficient to support termination under subsections (D) and (E), we reject Mother's contentions that the findings cannot stand because (i) no medical evidence was presented that J.M.L.'s unexplained fracture was the result of abuse or documenting the injuries Mother suffered at the hands of Father; (ii) I.S. was injured only once; and, (iii) the Department's main concern stemmed from Father's conduct, but the record reflected he had changed as evidenced by the lack of any criminal charges since J.L., Jr.'s birth and lack of drug use. While no medical evidence was presented, none was necessary under the facts of this case. The emotional state of the children at the time of the removal along with the testimony of Father's and Mother's counselors concerning Mother's and Father's relationship was sufficient to establish the home environment and Mother's conduct endangered the children's well-being. *See In re L.E.S.*, 471 S.W.3d at 925 (noting abusive conduct in home may be endangering); *In re*

–19–

*J.D.B.*, 435 S.W.3d at 463 (noting definition of endangering includes jeopardizing child's emotional health). Moreover, while I.S. may have been injured only once, the record reflects other conduct that together created an endangering environment and constituted a deliberate course of conduct. Finally, while Father may not have been charged with any new criminal offenses after 2014 and may have abstained from drugs, the trial court could have reasonably determined that evidence was outweighed by the extent of his prior history. *See In re J.O.A.*, 283 S.W.3d at 346 (noting evidence of improved conduct does not negate probative value of long history of irresponsible choices). We decide Mother's first two issues against her.

  2.  *Father*

We also decide against Father on his issue concerning the sufficiency of the evidence to support the findings his rights should be terminated under subsections (D) and (E). As discussed in connection with the finding that Mother's rights should be terminated under subsection (D), the home presented a danger to the children at the time they were removed because of J.M.L.'s unexplained injury, I.S.'s beating on the hand by Father, and Father's abuse of Mother. From the evidence that Father was the perpetrator of the abuse, along with the evidence of the children's emotional state at the time of removal as detailed above, a reasonable factfinder could have formed a firm conviction or belief that Father had knowingly placed the children in an endangering environment. *See In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) (noting child can suffer emotional abuse when witnessing domestic violence in home); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) (abusive or violent conduct by parent or other resident of child's home can produce endangering environment). No undisputed contrary evidence was presented and, as discussed in connection with Mother's issue, although Mother and Father both minimized the abuse and presented testimony from friends who expressed no concerns

about them, this evidence was not so significant as to preclude the trial court from terminating Father's parental rights under subsection (D). *See In re A.C.*, 560 S.W.3d at 631.

As to subsection (E), the record reflects Father was not only the perpetrator of abuse against Mother and I.S., but he also abused other girlfriends. Mother acknowledged knowing Father had been violent with other women he had dated, and Aunt testified she witnessed Father lock a former girlfriend in the trunk of his car. Although Father completed a batterer's intervention program in 2015, the abuse of Mother continued after that. Moreover, Harris, the "ongoing caseworker," testified Father was verbally aggressive towards Grandmother, the children's attorney ad litem, and herself, and the record reflects Aunt and her family "disconnected" from Father sometime before J.L.L. was born in 2015 in part because of his aggression. Additionally, the record reflects Father had an extensive criminal record that began in 2003 and included convictions for possession with intent to deliver a controlled substance. While Father had not had any criminal charges brought against him for drugs in several years, Aunt testified she and her family also "disconnected" from Father because he had taken a cousin "to get drugs." From this evidence, a reasonable factfinder could have formed a firm belief or conviction that Father engaged in conduct which endangered the children's well-being. *See*, *e.g.*, *In re P.L.T.*, 580 S.W.3d 331, 357 (Tex. App.—Houston [14th Dist.] 2019, pet. filed) (considering evidence of father's lack of impulse control and explosive temper in concluding evidence legally and factually sufficient to support termination of father's rights under (E)); *In re L.E.S.*, 471 S.W.3d at 923-24 (concluding evidence supported termination of father's rights under (E) where record reflected he had "protracted" history of domestic violence towards mother and extensive criminal record). No uncontradicted testimony to the contrary was presented and, although Father had not been charged with any crimes since J.L., Jr. was born and presented testimony from his employer, drug counselor, case monitor, and girlfriend that he was respectful, this evidence was not so significant as to preclude the trial

court from finding Father's rights should be terminated under subsection (E). *See In re A.C.*, 560 S.W.3d at 631.

In concluding the evidence is legally and factually sufficient to support the findings that Father's right should be terminated under subsections (D) and (E), we reject Father's contentions that the findings cannot stand because "[n]o evidence was adduced of any violent behavior on or near" the time J.M.L. was injured; his criminal history and domestic violence occurred prior to the birth of J.L., Jr., J.L.L., and J.M.L.; no evidence demonstrated by clear and convincing evidence that I.S.'s "spanking" did not constitute "reasonable discipline;" and, his one-time use of marijuana a year after the children were removed could not constitute endangerment. That no evidence was presented explaining J.M.L.'s injury or demonstrating I.S.'s spanking was not "reasonable discipline," however, does not negate the evidence establishing the endangering home environment created by that conduct together with Father's abuse of Mother, his aggression, and his lack of impulse control. Neither does the fact he may have used marijuana only once since the children were removed. Moreover, that his criminal history and the domestic violence may have occurred prior to his children's birth is of no import as the trial court was entitled to consider his behavior prior to the children's birth. *See In re J.O.A.*, 283 S.W.3d at 345 (noting endangering conduct is not limited to actions directed towards child but may include action before child's birth).

### B. Best Interest

In her third issue, Mother asserts the evidence is legally and factually insufficient to support the finding that termination is in the children's best interest. In making this argument, Mother asserts no testimony supports her "being cut-off from having a relationship with her children" and relies, in part, on the following portion of I.S. and S.S.'s counselor's answer to Mother's counsel's questioning:

Q.    So do you think it would be harmful for the children to be without a parent?

A.    Yes, I guess.

This testimony, however, was but a small portion of the counselor's testimony and was preceded by the counselor's testimony that she was concerned about the emotional state the girls were in when they were removed and worried the girls would regress if returned to Mother. Other evidence in the record reflects the children were "fragile," scared, and anxious when removed from the home and had been exposed to recurrent incidents of violence. Harris, the "ongoing" caseworker, testified she believed it was in the children's best interest to terminate Mother's rights, and Mother's counselor testified she did not believe the children should be returned to Mother. Aunt and Grandmother also believed it was in the children's best interest to terminate Mother's rights. Terminating Mother's parental rights would allow the children to be adopted by Aunt and Grandmother, who were able to meet the children's needs and had been providing the children a safe and nurturing environment. Both Aunt and Grandmother had the support of family, and Aunt also had the support of Fostering Connections, a program helping her prepare for the long-term care of the children. Additionally, the record reflects I.S. and S.S. had specifically stated they wanted to remain with Grandmother. From this evidence, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's rights was in the children's best interest. *See* FAM CODE § 263.307(b); *Holley*, 544 S.W.2d at 371-72; *see also*, *e.g.*, *In re B.M.S.*, 581 S.W.3d at 918-919 (concluding termination of father's rights was in children's best interest where children wanted to be adopted by foster family and father had been unable to provide a stable and safe environment for the children); *In re P.N.T.*, 580 S.W.3d at 357 (concluding termination of parents' rights was in child's best interest where parents were not meeting child's needs but foster parent was, parents had endangered child's well-being, and foster home was safe and stable placement). No undisputed evidence to the contrary was presented and, although Mother had taken steps to show the children should be returned to her, testified she had the support

–23–

of her grandmother and friend, and believed she could protect and nurture the children, this evidence was not so significant as to prevent the trial court from finding termination was in the children's best interest. *See In re A.C.,* 560 S.W.3d at 631. We resolve Mother's third issue against her.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE APPOINTMENT OF THE DEPARTMENT AS MANAGING CONSERVATOR

In her fourth issue, Mother asserts the evidence is legally and factually insufficient to support the appointment of the Department as managing conservator of the children. In arguing this issue, Mother asserts she should have been appointed instead and, quoting *In re B.B.M.,* 291 S.W.3d 463, 469 (Tex. App.—Dallas 2009, pet. denied), notes that "[w]hen a nonparent and a parent are both seeking managing conservatorship, the 'close calls' go to the parent." Having concluded the evidence is legally and factually sufficient to support termination of Mother's parental rights, however, we necessarily decide this issue against Mother.

## CONCLUSION

We affirm the trial court's judgments.

/Robert D. Burns, III/
ROBERT D. BURNS, III
CHIEF JUSTICE

190711F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF I.S. AND S.S., CHILDREN

No. 05-19-00709-CV

On Appeal from the 254th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-14-10695.
Opinion delivered by Chief Justice Burns, Justices Whitehill and Molberg participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment.

Judgment entered this 9th day of December 2019.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.L., JR., J.L.L., AND J.M.L., CHIDLREN

No. 05-19-00711-CV

On Appeal from the 254th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-17-19273.
Opinion delivered by Chief Justice Burns, Justices Whitehill and Molberg participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's judgment.

Judgment entered this 9th day of December 2019.