

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00059-CV

IN THE INTEREST OF L.W., A CHILD

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 91297

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

A few weeks after her birth, The Texas Department of Family and Protective Services removed L.W.[1] from Mother's care because of, among other things, Mother's admitted use of methamphetamine during the pregnancy and Mother's positive test for methamphetamine after she was released from the hospital. About one year later, on the petition of the Department, the trial court terminated Mother's parental rights to L.W. based on statutory grounds N and O and its finding that termination was in the best interests of the child.[2]  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O), (2).  In this appeal, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the best interest of L.W.  Because we find that the evidence was legally and factually sufficient to support the trial court's best-interest finding, we affirm the trial court's judgment.

## I.      Background

The evidence at trial showed that the Department opened an investigation on May 6, 2022, after it received a report from Hunt Regional Medical Center that Mother had tested positive for methamphetamine when she was admitted to the hospital on April 27, 2022, and again on May 6, 2022, after she gave birth to L.W.  During the investigation, Mother disclosed that she started using methamphetamine four years earlier but initially maintained that she had last used it before New Year's.  Later, she admitted that she used methamphetamine during the pregnancy but asserted that she used "just enough methamphetamine[] to calm her cravings."

---

[1]In order to protect the privacy of the child, we refer to her by her initials and refer to her family members by pseudonyms. *See* TEX. R. APP. P. 9.8(b)(2).

[2]The trial court also terminated the parental rights of L.W.'s unknown father.

She also disclosed (1) that she did not receive any prenatal care with L.W., (2) that, in the past, an ex-boyfriend had put her in the hospital as a result of domestic violence, and (3) that L.W. was a child born as a result of rape. Mother also agreed to take a hair-follicle drug test, but when the Department received the results, it was concerned that Mother was actively using methamphetamine.[3]

Over the course of the investigation, Mother told Cassandra Moreno, the Department's investigator, that she needed drug classes and rape counseling. Moreno suggested a drug assessment, drug classes, and counseling at Lakes Regional MHMR Center, as well as a program at Women in Need (WIN) that provided shelter, domestic violence classes, and counseling. Mother expressed an interest in going to Nexus for inpatient treatment, but Nexus did not accept her.

Moreno testified that the removal process was triggered when L.W. was ready for discharge from the hospital around June 16, 2022. She testified that removal was necessitated because of Mother's positive result for methamphetamine, her lack of stable housing, her prior history with the Department,[4] and her failure to engage in or complete any services to address her methamphetamine use. The Department filed a petition for protection of L.W. on June 28, 2022, and the trial court entered an order for protection that same day.

Stacie Graf, a conservatorship worker for the Department, testified that L.W. was in a kinship placement in the same home as her half-brother, C.W., whom the kinship placement

---

[3]Mother was released from the hospital about four days after giving birth.

[4]Mother's parental rights to C.W., who was born on May 23, 2020, were terminated due to her methamphetamine use.

adopted after Mother's parental rights were terminated. She testified that, in C.W.'s case, Mother's needs were similar to her needs in this case and that Mother had court-ordered services to assist with domestic violence, victimization, counseling, parenting, and substance-abuse treatment. In this case, the Department also addressed housing, stability, income, transportation, support, and Mother's seizures and high blood pressure.

Graf met with Mother on August 1, 2022, and developed a family service plan. At the adversary hearing on that same day, Mother agreed to work the services set forth in the service plan and ordered by the trial court. The ordered services included that Mother (1) submit to a drug and alcohol assessment and follow any recommendations; (2) complete an inpatient drug treatment program and follow any recommendations; (3) submit to a psychosocial evaluation and follow any recommendations; (4) complete individual counseling, parenting classes, and domestic violence class; (5) submit to drug tests; (6) participate in Narcotics Anonymous/Alcoholics Anonymous (NA/AA) or Celebrate Recovery at least three hours per week; (7) abstain from drug and alcohol use; and (8) complete a urine analysis and hair-follicle drug test that day. Mother completed a urine analysis and a hair-follicle test later that day.

In September 2022, Graf sent Mother for a drug test, but Mother failed to go, which resulted in the suspension of her visitation with L.W. because it was presumed that the test would have been positive. On September 13, Mother sent a text to Graf that stated she was on her way to Restored180, an inpatient treatment facility, and the facility confirmed that she had been admitted. However, Mother never responded to any of Graf's further inquiries regarding her time at Restored180. Thereafter, although Graf attempted to communicate with Mother at least

4

once a month by telephone, text, and email, Mother never responded to her.[5]  Graf also notified Mother monthly regarding drug tests.

The evidence also showed that Mother (1) did not submit to a drug and alcohol assessment, (2) did not complete inpatient treatment, (3) never provided proof of attendance at NA/AA or Celebrate Recovery, (4) did not submit to psychosocial evaluation, and (5) did not attend individual counseling or parenting classes.  Graf explained that it was important for Mother to complete parenting classes because she had four children and was not caring for any of them due to her methamphetamine use.  Mother also did not attend and complete the WIN program to address domestic violence and her lack of stable housing.  Mother never provided the Department with any proof of stable housing or income.  Through the final permanency hearing on May 15, 2023, Mother had made no progress on her services, housing, or income.  In addition, Mother did not attend the permanency hearings in December, March, or May.[6]

Graf also testified that Mother's last visit with L.W. was on September 1, 2022, and that, since that time, Mother had not expressed that she wanted to maintain a relationship with L.W. and had sent no gifts, cards, or letters to L.W.  She opined that she did not believe Mother could provide L.W. with a safe and stable environment because Mother had not demonstrated that she could provide that for herself.  Graf explained that L.W. was thirteen months old and needed a safe place to eat and sleep, with no exposure to drugs, and that she needed routine medical and dental care and safe and reliable transportation, none of which Mother showed she could provide.

---

[5]Graf testified that Mother left her a voicemail on April 21 when Graf was on leave.  However, when Graf attempted to contact her the next week, Mother did not respond.

[6]Mother also did not attend the final hearing or respond to communications from her attorney.

Graf also testified that L.W. needed timely attention to her needs, physical stimulation to aid her development and learning, and loving care so she could learn to bond. She opined that the kinship placement met all of L.W.'s needs. She also opined that, because Mother had not demonstrated that she had the skills necessary to meet L.W.'s needs, L.W. would be in emotional and physical danger if she were placed in the unsupervised care of Mother. Because Mother did not actively engage in the case, did not show a willingness to improve her circumstances so she could meet L.W.'s needs, and did not make any effort to parent L.W., Graf opined that it was in L.W.'s best interest that Mother's parental rights be terminated.

Graf testified that the Department's plan for L.W. was for the kinship placement to adopt her,[7] if Mother's parental rights were terminated. Based on her observation of L.W. in her placement, Graf opined that L.W. was bonded with her brother, C.W., and with the kinship placement and their other children. She explained that C.W. and the other children played with L.W., shared their toys with her, talked to her, and were very happy she was there. In addition, L.W. was happy and comfortable around her kinship placement and liked when they held and hugged her. Graf also testified (1) that the household was safe and stable, (2) that the family was in the same house for at least three years, (3) that they had a stable and adequate income, and (4) that the family seemed very comfortable and secure.

Kayla Jean Anderson, the Court Appointed Special Advocate (CASA) volunteer assigned to the case, testified that she attempted to communicate with Mother throughout the case but was not successful. She had no opinion regarding Mother's parenting abilities because of the lack of

---

[7]The kinship placement desired to adopt L.W.

6

communication and because she was unable to observe her with L.W. Like Graf, she opined that Mother was not able to meet L.W.'s physical and emotional needs because of Mother's absence from the case. She also agreed that Mother had not demonstrated the ability to provide a safe and stable environment for L.W. She also opined that L.W. would be in emotional and physical danger in the unsupervised care of Mother since Mother was absent during the case, did not attend and pass drug tests, did not attend visitation with L.W., and did not complete her services. Anderson also concurred with Graf's assessments of L.W.'s relationship with the kinship placement and of their home environment.

After arguments of counsel, the trial court found that termination of the parental rights of Mother was in the best interest of L.W. and that the evidence supported such termination under statutory grounds N and O. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N), (O), (2). This appeal ensued.

## II.     Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "This Court is therefore required to 'engage in an exacting review of the entire record to determine if the evidence is . . .

7

sufficient to support the termination of parental rights.'" *Id.* (quoting *In re A.B.*, 437 S.W.3d at 500). "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *Id.* (alteration in original) (quoting *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied)).

"In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest." *Id.* (citing TEX. FAM. CODE ANN. § 161.001; *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012)). "'Clear and convincing evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007). "This standard of proof necessarily affects our review of the evidence." *Id.*

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *In re J.P.B.*, 180 S.W.3d at 573).

8

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). Also, we "consider whether disputed evidence is such that a reasonable fact[-]finder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re J.F.C.*, 96 S.W.3d at 266). "In applying this standard, '[a]n appellate court's review must not be so rigorous that the only fact[-]findings that could withstand review are those established beyond a reasonable doubt.'" *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (first alteration in original) (quoting *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

"'[I]n making this determination,' we must undertake '"an exacting review of the entire record with a healthy regard for the constitutional interests at stake."'" *In re L.E.S.*, 471 S.W.3d at 920 (alteration in original) (quoting *In re A.B.*, 437 S.W.3d at 503). We "must nevertheless still provide due deference to the decisions of the fact[-]finder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)). "We also recognize that . . . the fact-finder . . . may believe all, part, or none of a witness' testimony." *In re A.M.*, No. 06-18-00012-CV, 2018 WL 3077784, at

\*3 (Tex. App.—Texarkana June 22, 2018, pet. denied) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d at 109).

"Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, '"the rights of natural parents are not absolute; protection of the child is paramount."'" *In re L.E.S.*, 471 S.W.3d at 920 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

## III.    Sufficient Evidence Supported the Trial Court's Best-Interest Finding

In her sole issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in the best interest of L.W. "There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re R.W.*, 627 S.W.3d 501, 516 (Tex. App.—Texarkana 2021, no pet.) (quoting *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi–Edinburg Feb. 28, 2013, pet. denied) (mem. op.)). "Termination '"can never be justified without the most solid and substantial reasons."'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

To determine the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent

10

that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b). These factors are not exhaustive, and there is no requirement that all of them be proved to terminate parental rights. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *Id.* at 28.

At thirteen months old, L.W. was too young to verbally express her desires. However, the evidence showed that L.W. had been placed in a kinship placement for some months with the adoptive family of her half-brother, C.W. It also showed that L.W. was happy in that family and was bonded with C.W., his siblings, and his adoptive parents. Although testimony showed that when Mother visited L.W. they were bonding and Mother acted appropriately, at the time of the hearing, Mother had not visited or had any contact with L.W. for over nine months. Based on this evidence, we find the first *Holley* factor favors termination.

Although there was no evidence that L.W. had any special needs, the evidence showed that, as a young child, she needed a caregiver that would provide her a safe and stable environment, attend to her physical needs, and provide her the necessary care and support to meet her emotional and developmental needs. In addition, the evidence showed that, after Mother began using methamphetamine, she gave up custody of her two oldest children to their grandmother, her parental rights to C.W. were terminated because of her substance abuse, and L.W. was removed from her care primarily because of her substance abuse. The evidence also showed that, although the Department offered her services to address her substance abuse and to

11

reinforce her parenting skills, Mother failed to complete any of those services. As a result, the evidence showed that Mother failed to demonstrate that she had the skills and ability to provide for the needs of L.W. and showed that she was uninterested in addressing her substance-abuse issues or acquiring the skills and ability to provide for L.W.'s needs. Based on this evidence, we find the second, third, and fourth *Holley* factors heavily favor termination.

As previously noted, Mother had not visited or made contact with L.W. for over nine months. The evidence also showed that she had sent no gifts, cards, or letters for L.W. and never expressed a desire to maintain a relationship with L.W. Also, there was no evidence that Mother made any inquiry regarding the health or well-being of L.W. during her nine-month absence from the case. Further, Mother failed to attend the final hearing in which her parental rights to L.W. were at issue. Those acts and omissions strongly indicate that the parent-child relationship between Mother and L.W. was not a proper one and favored termination.

Finally, the excuses offered for Mother's acts and omissions were her addiction to methamphetamine and her history of domestic violence. However, the Department offered services that were designed to address those issues and the trauma associated with them. Mother, although initially expressing an interest in those services, failed to attend or complete any of them. As a result, the fifth and ninth *Holley* factors also favor termination.

Based on this record and applying the clear and convincing evidence standard, we find that a fact-finder could reasonably form a firm belief or conviction that termination of Mother's parental rights was in the best interest of L.W. *See In re L.E.S.*, 471 S.W.3d at 920. As a result,

12

we find that the evidence was legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's sole issue.

## IV.      Conclusion

For the reasons stated, we affirm the trial court's judgment.

Scott E. Stevens
Chief Justice

Date Submitted:       October 23, 2023
Date Decided:         October 27, 2023